# EXHIBIT A

11-15-18 @ /40

COPY

## SUMMONS **BY FAX**
### (CITACION JUDICIAL)

SUM-100

| | |
|---|---|
| **NOTICE TO DEFENDANT:** | **FOR COURT USE ONLY** |
| *(AVISO AL DEMANDADO):* | *(SOLO PARA USO DE LA CORTE)* |

FORD MOTOR COMPANY, a Delaware Corporation; D.O.
NERONDE, INC., a California Corporation, dba AUBURN FORD; and
DOES 1 through 10, inclusive.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

KORI A. WITTINGER and ALAN J. WITTINGER

Superior Court of California.
County of Placer

NOV 14 2018

Jake Chatters
Executive Officer & Clerk
By: S. Hubbard, Deputy

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case. ¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

| | CASE NUMBER |
|---|---|
| The name and address of the court is: | *(Número del Caso):* |
| *(El nombre y dirección de la corte es):* | **SCV  0042126** |
| Placer County Superior Court | |
| 10820 Justice Center Drive | |
| Roseville, CA 95678 | |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Knight Law Group, LLP
10250 Constellation Blvd., Suite 2500, Los Angeles, CA 90067
(310) 552-2250

| DATE: | **NOV 14 2018** | Clerk, by | **S. Hubbard** | , Deputy |
|---|---|---|---|---|
| *(Fecha)* | | *(Secretario)* | | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

COPY

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* FORD MOTOR COMPANY, a Delaware Corporation

   under: ☒ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)

   ☐ other *(specify):*
4. ☒ by personal delivery on *(date):* 11-15-18

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 |
| Judicial Council of California | | www.courtinfo.ca.gov |
| SUM-100 [Rev. July 1, 2009] | | American LegalNet, Inc. |
| | | www.FormsWorkflow.com |

KNIGHT LAW GROUP, LLP
Steve Mikhov (SBN 224676)
stevem@knightlaw.com
Amy Morse (SBN 290502)
amym@knightlaw.com
10250 Constellation Blvd, Suite 2500
Los Angeles, CA 90067
Telephone: (310) 552-2250
Fax: (310) 552-7973

Attorneys for Plaintiffs,
KORI A. WITTINGER, and
ALAN J. WITTINGER

FILED
Superior Court of California
County of Placer

NOV 14 2018

Jake Chatters
Executive Officer & Clerk
By: S. Hubbard, Deputy

SUPERIOR COURT OF CALIFORNIA

COUNTY OF PLACER

| | |
|---|---|
| KORI A. WITTINGER, and<br>ALAN J. WITTINGER<br><br><br>Plaintiffs,<br><br>vs.<br><br>FORD MOTOR COMPANY, a Delaware<br>Corporation; D.O. NERONDE, INC., a<br>California Corporation, dba AUBURN<br>FORD; and DOES 1 through 10, inclusive.<br><br><br>Defendants. | Case No.:  **S C V  0 0 4 2 1 2 6**<br><br>Unlimited Jurisdiction<br><br><br>**COMPLAINT**<br><br>1. **FRAUD IN THE INDUCEMENT -<br>  INTENTIONAL<br>  MISREPRESENTATION**<br>2. **NEGLIGENT<br>  MISREPRESENTATION**<br>3. **FRAUD IN THE INDUCEMENT -<br>  CONCEALMENT**<br>4. **FRAUD IN PERFORMANCE OF<br>  CONTRACT – INTENTIONAL<br>  MISREPRENTATION**<br>5. **VIOLATION OF THE SONG-<br>  BEVERLY ACT**<br>6. **VIOLATION OF THE CONSUMERS<br>  LEGAL REMEDIES ACT**<br>7. **NEGLIGENT REPAIR**<br><br>*Assigned for All Purposes to the<br>Honorable*<br><br>Department |

BY FAX

-1-

WITTINGER, et al. v. FORD COMPLAINT

1      Plaintiffs, KORI A. WITTINGER and ALAN J. WITTINGER, allege as follows against

2  Defendants FORD MOTOR COMPANY, a Delaware Corporation ("FORD"); D.O. NERONDE,

3  INC., a California Corporation, dba AUBURN FORD ("AUBURN FORD"); and DOES 1 through

4  10 inclusive, on information and belief, formed after an inquiry reasonable under the

5  circumstances:

6                              **DEMAND FOR JURY TRIAL**

7      1.   Plaintiffs hereby demand trial by jury in this action.

8                              **GENERAL ALLEGATIONS**

9      2.   This lawsuit arises out of the defective 6.0-liter diesel engine installed in Ford-brand

10  "Super Duty" trucks, including a truck purchased by Plaintiffs from an authorized Ford dealership

11  in Auburn, California and for which FORD issued a written warranty. Plaintiffs assert causes of

12  action against FORD for fraudulent inducement of Plaintiffs into the purchase of the Vehicle by

13  both intentional and negligent misrepresentations of facts, and by concealment of facts; against

14  FORD for fraud in the performance of its obligations under the written warranty; against FORD for

15  breach of its statutory obligations under the Song-Beverly Consumer Warranty Act under both the

16  express and implied warranty provisions of the statute; against FORD for violation of the

17  Consumers Legal Remedies Act ("CLRA"); and, against AUBURN FORD for negligent repair.

18      3.   Plaintiffs, KORI A. WITTINGER and ALAN J. WITTINGER, are individuals residing in

19  the City of Newcastle, County of Placer, State of California.

20      4.   Defendant FORD is and was a Delaware Corporation registered to do business in the State

21  of California with its registered office in the City of Los Angeles, County of Los Angeles, State of

22  California. At all relevant times herein, FORD was engaged in the  business of designing,

23  manufacturing, testing, constructing, assembling, inspecting, marketing, distributing, and selling

24  motor vehicles, motor vehicle chassis, and motor vehicle components (including but not limited to

25  engines and engine components) in the State of California, including in the County of Placer.

26      5.   Defendant N.O. NERONDE, INC. dba AUBURN FORD is and was a Corporation,

27  conducting business in the County of Placer, State of California. At all relevant times herein,

28  AUBURN FORD was engaged in business as a motor vehicle dealership certified and authorized

1    by FORD to sell Ford-brand vehicles and vehicle components, and to perform service and repair of
2    Ford-brand vehicles pursuant to FORD's express written warranties.

3       6.    Plaintiffs do not know the true names and capacities, whether corporate, partnership,
4    associate, individual or otherwise of Defendants sued herein as Does 1 through 10, inclusive, under
5    the provisions of section 474 of the California Code of Civil Procedure. Defendants Does 1 through
6    10, inclusive, are in some manner responsible for the acts, occurrences and transactions set forth
7    herein, and are legally liable to Plaintiffs. Plaintiffs will seek leave to amend this Complaint to set
8    forth the true names and capacities of the fictitiously named Defendants, together with appropriate
9    charging allegations, when ascertained.

10      7.    All acts of corporate employees as alleged were authorized or ratified by an officer,
11   director, or managing agent of the corporate employer.

12      8.    Each Defendant, whether actually or fictitiously named herein, was the principal, agent
13   (actual or ostensible), or employee of each other Defendant, and in acting as such principal or within
14   the course and scope of such employment or agency, took some part in the acts and omissions
15   hereinafter set forth by reason of which each Defendant is liable to Plaintiffs for the relief prayed
16   for herein.

17      9.    On April 23, 2006, Plaintiffs purchased a new Ford-brand 2006 Ford F-350 Super Duty.
18   VIN: 1FTWW31P56EC19134 ("the Vehicle") at an authorized Ford dealership in the County of
19   Placer. The sales contract is attached and incorporated by this reference as **Exhibit 1.** The Vehicle
20   was covered by express written warranties by which FORD undertook to preserve or maintain the
21   utility or performance of the Vehicle or to provide compensation if there was a failure in such utility
22   or performance.

23      10.   Ford-brand vehicles equipped with the 6.0-liter engine were sold with FORD's Limited
24   Warranty (including the 6.0-liter Powerstroke Diesel Engine warranty terms), which covered the
25   "engine and engine components against defects in factory-supplied materials or workmanship for
26   five years after the warranty start date or 100,000 miles, whichever occurs first," and provides that
27   "[d]uring this coverage period, authorized Ford Motor Company dealers will repair, replace, or
28   adjust all parts on your vehicle that are defective in factory-supplied materials or workmanship."

-3-

11.   The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to warranty and it developed other serious defects and nonconformities to warranty including a defective 6.0-liter engine, as detailed herein.

12.   Plaintiffs hereby revoke acceptance of the sales contract.

13.   Pursuant to the Song-Beverly Consumer Warranty Act (Civil Code sections 1790 et seq., hereinafter the "Act"), the Vehicle constitutes "consumer goods" used primarily for family or household purposes, and Plaintiffs have used the Vehicle primarily for those purposes.

14.   Plaintiffs, and each of them, are "buyers" of consumer goods under the Act.

15.   Defendant FORD is a "manufacturer" and/or "distributor" under the Act.

## FORD'S DEVELOPMENT AND KNOWING DISTRIBUTION OF THE
## DEFECTIVE 6.0-LITER DIESEL ENGINE

16.   FORD obtained its 6.0-liter diesel engines from its supplier, Navistar International Transportation Corporation (hereinafter "Navistar").

17.   At all times relevant to this action, FORD was aware of severe and pervasive defects in the 6.0-liter diesel engine.

18.   The defects in the 6.0-liter engine caused FORD to delay the launch of vehicles equipped with the engine from a planned August 1, 2002 launch date until November 4, 2002.

19.   On May 15, 2002, as FORD was planning production of its first vehicles to be equipped with 6.0-liter diesel engines, Charlie Freese, FORD's Chief Engineer of Diesel Engines, identified "multiple high risk items" with the 6.0-liter diesel engines which would delay the production start. They included injection control pressure sensor (ICP) failures, piston failures, and injector failures, which were "of particularly great concern." The problems were so serious that FORD considered extending production of the predecessor 7.3-liter diesel engine in place of the 6.0-liter diesel engine.

20.   On May 29, 2002, just four days before the scheduled kick-off of 6.0-liter diesel engine production, Freese identified additional "major issues" with the 6.0-liter engine in addition to the ICP failures, piston failures, and injector failures. Those "new concerns" included, among others, problems with the head gaskets, turbo charger, the engine idle, and the injector driver module (IDM).

-4-

21.     On July 30, 2002, FORD held a New Model Launch Meeting at which FORD projected that some problems could not be resolved until after the vehicles were already being produced and sold. At that same meeting, FORD reviewed the readiness of suppliers for the planned vehicles, and singled out and rated Navistar (the supplier of the 6.0-liter engine) as "High Risk" due to lack of durability testing and late design changes.

22.     By August 23, 2002, FORD still was addressing injector defects causing idle problems, cold start problems, engine stall problems, and injector failures. Although Navistar sent engines with new process injectors to FORD, the durability tests for these engines were not scheduled for completion until the week of October 9, 2002, less than a month before production was to begin.

23.     As the November 4, 2002 production date neared, problems with the 6.0-liter engine persisted and FORD was unable to determine their root cause. Nonetheless, FORD decided it could not continue delaying the launch and instead began producing and selling the vehicles, despite knowing that the 6.0-liter diesel engine was defective.

24.     On November 12, 2002, Steven Henderson, a FORD executive, wrote that FORD was "in the middle of the 6.0L launch, and … things are not going well." Although the launch was delayed a week, and the entire Navistar team was working full time, the problems were "not fully resolved yet."

25.     Without remedying the defects, FORD continued to equip subsequent model years of its trucks, including the 2006 Ford F-350, with the 6.0-liter diesel engine. Regardless of tweaks made to the 6.0-liter engine by FORD during subsequent years, these same defects to the engine persisted throughout FORD's production and sale of vehicles with this engine.

26.     As early as July 2003, FORD received information from its dealerships nationwide concerning customer complaints about the defects, and the dealers' inability to resolve the defects, and implemented specific measures to communicate information to its dealerships, which included:

      a.  A specialized website for technical communications to dealership personnel about the 6.0-liter diesel engine and its problems;

      b.  Incentivizing diesel technicians to use the website;

///

-5-

    c. Conducting weekly round-tables between FORD personnel and dealership personnel concerning the defects; and

    d. Communicating the latest 6.0-liter issues to dealership sales personnel via weekly messages on its specialized website "FMCDealer.com" and dedicated "Fordstar" broadcasts for sales personnel.

27. By March 2004, Frank Ligon, FORD's Director of Service Engineering Operations, suggested that John Koszewnik, FORD's Director of North American Diesel, personally attend meetings of FORD's "dealer council" to explain the 6.0-liter engine problems to dealership personnel in response to their concerns, but believed "we're going to be dealing with this issue for the forseeable future" [sic] and that "Customer think Diesels are supposed to last forever!" [sic].

28. By August 2004, Mr. Ligon received information from a Ford Customer Service Division Regional Manager that dealerships were "throwing in the towel and pre-disposing customers that Ford will buy back" defective 6.0-liter trucks, which was "symptomatic of numerous instances of 6.0L diesel problems growing in the field." Mr. Ligon responded to the Regional Manager by outlining the distribution of FORD-approved information on Ford's websites but also noted that there was no "definitive repair action or production parts to address this repair universe."

29. FORD's inability to deal with the problems continued through the 2006 model year. In a July 22, 2005 memorandum, Chris Bolen, FORD's director of North America Powertrain Manufacturing, wrote that the problems with the quality of the 6.0-liter engines were having "disastrous effects on this customer and segment."

30. In January 2006 – nearly four years after problems first surfaced, and as production and sale of the affected vehicle models were still underway – a FORD engineering study conducted an analysis of warranty claims to determine the root causes of the problems that continued to plague the 6.0-liter engine. FORD attributed the problems to "the same root cause": "injector sealing issues" – specifically, leaks between the fuel rail, combustion chamber, and coolant jacket.

31. Evidence of the inherent nature of the defects again emerged in June 2006, when FORD engineers discovered that 6.0-liter engines exceeded FORD's own cylinder pressure specifications for "normally" performing engines. The issue was raised after a Ford-brand dealership suggested a

defective engine could be blamed on an aftermarket part; the aftermarket part manufacturer disputed blame by pointing out FORD's own published information discussing excessive cylinder pressures caused by engine defects, not by aftermarket parts. One engineer, Mike Frommann, in a June 2006 email, worried that these specifications might be published or subpoenaed, and could cause FORD to "face a class action." *He recommended that all emails discussing the issue be deleted.*

32.    In January 2007, nearly five years after it discovered the defects, FORD sued the engine supplier, Navistar, for what it termed "exceptionally high repair rates and warranty costs due to quality problems attributable to Navistar," including "design flaws." The details of this litigation were not made public record, and were in fact sealed.

## FORD'S PUBLIC STATEMENTS

## CONCERNING THE 6.0-LITER DIESEL ENGINE

33.    Despite FORD's knowledge of the defective engine, it continued to represent that the Vehicle was of high quality and reliable. For example, Mark Fields, FORD's President of the Americas, publicly proclaimed that the 6.0-liter engine – the very same engine whose design and quality issues led FORD to sue Navistar – was a "great engine." Despite its knowledge of the 6.0-liter engine's many flaws and quality concerns, FORD trained its dealers throughout the country to specifically tout the supposedly superior attributes of the engine, without ever mentioning its troubled history of design, manufacturing, and reliability defects.

      a.    FORD continued to misrepresent the qualities of, and conceal its true knowledge of, the defective engine in its marketing materials, in an effort to protect the "Ford" brand and to keep both potential customers and existing customers from learning that the engine was in fact defective.

      b.    The promotional materials stated that the 6.0-liter diesel engine is the "longest lasting diesel motor" and that "altogether, the 6.0 L Power Strike is the longest lasting diesel in its class."

      c.    These promotional materials also touted the 2006 Ford F-350 as having: "The best payload, best conventional towing, best braking performance, highest GVWR, unsurpassed GCWR, . . ., best 5th wheel towing."

-7-

d.  These promotional materials also touted the 2006 Ford F-350 as "best-in-class: horsepower. gas torque, unsurpassed diesel horsepower."

e.  These promotional materials advertised that the Super Duty powertrain, which includes the 6.0-liter diesel engine, "delivers the right power, right when you need it." and that the "powertrain delivers the muscle to get the job done."

f.  These promotional materials represented that the 2006 Ford F-350 has the strength to handle the toughest assignments and the 6.0-liter diesel engine is built "Ford tough."

g.  These promotional materials represented that the 6.0-liter engine has "best-in-class torque" and "best-in-class diesel horsepower."

h.  These promotional materials represented : "The all-new 32-valve 6.0 L Power Stroke V8 turbo diesel generates so much power that an entirely new automatic transmission has been developed to handle the increased loads."

i.  These promotional materials represented also represented that the 6.0-liter engine was reliable and well-made, and that the 2006 Ford F-350 and other vehicles with this engine have superior towing capacity and capabilities.

j.  These promotional materials represented advertised the 2006 Ford F-350, and its 6.0-liter engine, as high-quality products that were free from inherent defects.

34.    FORD never acknowledged the defective nature of the 6.0 liter engine or its catastrophic repair rates in its public filings with the Securities and Exchange Commission, further concealing this information from the public.

## FORD'S FAILURE TO RESOLVE OR DISCLOSE
## THE ENGINE DEFECTS

35.    Throughout FORD's production and sale of the engines, FORD never developed a repair plan in which FORD would comply with the above warranties by identifying and eliminating the root cause of defects to the 6.0-liter engines.  As detailed in the September 7, 2004 memorandum from Frank Ligon, FORD's Director of Service Engineering Operations, FORD did "not have a definitive repair action or production parts to properly address the concern universe."  As revealed in an October 2004 email between FORD executives, FORD rejected pilot programs that would

1  have had FORD technical experts assist dealerships with repairs.

2      36.    Nor did FORD implement a voluntary recall program that would have required FORD to

3  completely repair or replace the defective engines. FORD executives had suggested that FORD

4  authorize full and complete repairs of defective engines – essentially throwing the "kitchen sink"

5  at the vehicle in order to help eliminate the need for subsequent repairs. However, in an email on

6  October 8, 2004, Michael Berardi, FORD's CBG manager, said "[t]hat particular philosophy is

7  opposite of what we have been training our dealers to do and could lead to a very expensive

8  warranty bill across vehicle lines."

9      37.    FORD instead had authorized dealers implement a "Band-Aid" strategy that allowed the

10  dealers to take only limited repair measures, such as cleaning or replacing individual components,

11  which did not properly remedy or resolve the underlying defect. This strategy reduced FORD's

12  warranty spending but did nothing to fix the underlying root causes of the defects.

13      38.    In 2006, for example, among FORD's "6.0-liter Top Parts Warranty Actions" were new

14  procedures adopted to address "turbo coking" and "EGR coking," issues that had plagued the engine

15  since its inception. According to a July 2007 email between FORD executives, rather than replace

16  the coked turbo charger or EGR valve, FORD commenced a program in mid-2006 of simply

17  "cleaning" the parts in question, thus saving FORD a projected $9 million and $2.5 million in

18  warranty spending, respectively, on those two items.

19      39.    These minor, limited measures merely addressed the symptoms. For example, the removal

20  of built up soot effectively concealed the seriousness and extent of the underlying root cause – poor

21  combustion. FORD's own study concluded that the cause was improper injector sealing and

22  associated leaks. Moreover, these measures misled customers to believe that the underlying

23  problem had been fixed, when in fact the symptom likely would reoccur on a later date, possibly

24  when the warranty would have expired, typically forcing the additional expenses to be borne by the

25  customer rather than by the dealer. These measures prevented customers from realizing the

26  defective nature of their engine.

27      40.    In FORD's own analysis of the multitude of warranty claims on the troubled 6.0-liter

28  engine, it concluded that the problems associated with the 6.0-liter engine were the result of "the

WITTINGER v. FORD COMPLAINT

1  same root cause." As noted above, FORD had attributed the problems to "injector sealing issues."
2  Specifically, leaks between the fuel rail, combustion chamber, and coolant jacket.

3  41.   Despite having this critical knowledge, FORD concealed it from consumers, and
4  continuously treated the symptoms rather than the underlying "root cause" of the problem. FORD
5  has never publicly acknowledged this root cause.

6  42.   In addition, FORD has computer systems whereby it monitors warranty claims,
7  communicates with its authorized dealers, and monitors the malfunctions and repair records of all
8  these vehicles. These systems include MORS (Master Owner Relations System). AWS (Analytical
9  Warranty System), and CQIS (Common Quality Indicator System).

10  43.   Through these systems, FORD has detailed information regarding each time a vehicle is
11  brought into a Ford-brand dealership for repair, including but not limited to the symptoms that
12  required the unit be brought in for service, the diagnosis of the problem, the repair authorized by
13  FORD, and the work performed on the vehicle.

14  44.   FORD accumulated a massive database through which it realized that the minor, limited
15  work it was authorizing was inadequate to properly repair these defective engines, and major
16  repairs, including engine replacement, were necessary to address these defects.

17  45.   FORD engineers referred to the failing parts as the "usual suspects." In a presentation
18  dated July 10, 2007, FORD stated, "Causal parts are the usual suspects – Cylinder Head/Head
19  Gasket, Engine Ass'y, EGR Cooler, EGR Valve."

20  46.   FORD continued its practice of only authorizing minor, ineffective repairs of these engine
21  defects. FORD unfairly benefitted by this practice because FORD knew that after the warranty
22  expired, the vehicle owner, rather than FORD or its dealerships, would have to pay for all future
23  repairs.

24  47.   Those "Band-Aid" repair strategies were performed on Plaintiffs' Vehicle. FORD and its
25  dealerships (which are FORD's authorized agents for warranty repairs), represented that the repairs
26  would fix the Vehicle, despite their knowledge that the repairs performed would merely postpone
27  the problem in the 6.0-liter Navistar diesel engine until the engine was out of warranty.

28  ///

## PLAINTIFFS' RELIANCE ON
## FORD'S PUBLIC STATEMENTS

48.    Prior to Plaintiffs deciding to purchase the Vehicle, Defendant FORD distributed promotional materials for the 2006 Ford F-350 with the 6.0-liter diesel engine, as described in Paragraph 33 above.

49.    Plaintiffs observed the promotional material generated and disseminated by FORD which represented the superior qualities of the 2006 Ford F-350 truck.

50.    Plaintiffs believed and relied on these written representations concerning the qualities and capabilities of the 2006 Ford F-350 and its 6.0-liter diesel engine when making the decision to purchase the Vehicle.

51.    Plaintiffs purchased the Vehicle for recreational purposes. Specifically, Plaintiffs wanted a long-lasting truck that could offer superior horsepower and torque.

52.    Prior to Plaintiffs deciding to purchase the Vehicle, Plaintiffs were led by the sales personnel at FORD's authorized seller of Ford-brand vehicles, that 2006 Ford F-350  vehicles equipped with a 6.0-lier engine would offer superior power and tow capacity.  Plaintiffs truly believed that they were making a wise investment decision in purchasing the Vehicle.

53.    Plaintiffs believed and relied on these verbal representations made by FORD's authorized sales personnel, concerning the qualities and capabilities of the 2006 Ford F-350 and the 6.0-liter diesel engine when making the decision to purchase the Vehicle.

54.    Based on the foregoing written and verbal representations by FORD and its authorized agents, on which Plaintiffs reasonably relied, they purchased the Vehicle on April 23, 2006.

55.    Despite FORD's representations and advertisements to the contrary, FORD's 6.0-liter diesel engines in general have had severe and pervasive quality defects, which FORD failed to disclose to consumers. As a result of these defects, Ford-brand trucks equipped with the 6.0-liter engine, including the 2006 Ford F-350, have exhibited continuing problems with turbo charger systems, fuel injection systems, head gaskets, EGR valves, cooling systems and coolers plugging, and many other problems.

///

56.     As described in detail below, FORD and its dealerships: (a) rather than identifying and eliminating the root cause of these defects, produced and sold the 2006 Ford F-350 to Plaintiffs and other consumers, knowing it contained a defective engine; (b) adopted through its dealers, a Band-Aid strategy of offering minor, limited repair measures to customers who sought to have the defects remedied, a strategy that reduced FORD's warranty expenditures but did not resolve the underlying defects and, in fact, helped to conceal the defects until the applicable warranties expired; and (c) intentionally and fraudulently concealed from Plaintiffs and other consumers the existence of these defects prior to the sale or any time thereafter, and fraudulently concealed from Plaintiffs its inability to repair these inherent defects, which prevented the truck from conforming to its applicable warranties.

## PLAINTIFFS' PROBLEMS WITH THE VEHICLE
## AND REPAIR ATTEMPTS

57.     After purchasing the Vehicle, Plaintiffs began experiencing problems with the Vehicle's 6.0-liter engine.   Specifically, the Vehicle's check engine light illuminated and the Vehicle experienced numerous oil leaks.  For example, the Vehicle suffered from problems of oil in the in-take as well as on the exhaust gas recirculation valve and the valley of the engine. In addition, the exhaust gas recirculation cooler and oil cooler were not functioning as designed and the Vehicle experienced problems with the turbo.

58.     These problems caused Plaintiffs to experience numerous difficulties. including an inability to tow.

59.     FORD, through its authorized repair facilities, has attempted to make repairs to the Vehicle's engine on multiple occasions and failed to permanently remedy the Vehicle's persistent problems.

60.     These ongoing problems have impaired the use, value, and safety of the Vehicle.

61.     Plaintiffs attempted to have the engine issues fixed on many occasions. Each time, the dealership's mechanics tried the same or different remedies. but the problems with the engine persisted.

///

62.    FORD, continually represented that the repairs "fixed" the problems with Plaintiffs' 6.0-liter engine. Plaintiffs relied on FORD's representations, that the repairs "fixed" the problems.

## ALL STATUTES OF LIMITATION ARE TOLLED BY THE DISCOVERY RULE
## AND THE DOCTRINE OF FRAUDULENT CONCEALMENT

63.    FORD misrepresented the quality, engine capacity, and towing capacity of the 6.0-liter Navistar diesel engine to Plaintiffs at the time of the sale of the Vehicle.

64.    FORD continued to misrepresent its ability to repair the Vehicle in conformity with the warranty throughout the warranty period.

65.    At all relevant times, FORD was aware of the defects in the 6.0-liter Navistar diesel engine.

66.    At all relevant times, FORD was aware of FORD's inability to repair the defects in the 6.0-liter Navistar diesel engine.

67.    These defects were known by FORD to cause serious problems, including stalling, non-starting, oil leaks, power loss, and smoking. If and when such symptoms manifest during operation of the Vehicle they pose a serious threat of personal injury to Plaintiffs, their passengers, and third parties.

68.    FORD had a duty to disclose the concealed facts alleged above because FORD knew that Plaintiffs did not know a material fact, and further knew that such facts were not readily accessible to the Plaintiffs because they actively concealed those facts.

69.    FORD had a duty to disclose the concealed facts alleged above, because FORD made several partial or misleading half-truths in its marketing materials, and through their authorized sales representatives about the quality, characteristics, reliability, and towing capacity of the 6.0-liter Navistar diesel engine.

70.    FORD had a duty to disclose the concealed facts alleged above because they actively concealed material facts in order to induce a false belief.

71.    FORD intended for Plaintiffs to rely on those misrepresentations to conceal the fact that the Vehicle's engine could not be repaired.

72.    Prior to the sale of the Vehicle, and at all times thereafter, FORD therefore failed to disclose the existence of the Vehicle's inherent defects to Plaintiffs, and FORD failed to disclose

-13-

1  their inability to repair these inherent defects, which prevented the Vehicle from conforming to its
2  applicable warranties.  Further, from and after the sale of the 2006 Ford F-350, FORD and
3  fraudulently concealed from purchasers, including Plaintiffs, the fact that Ford-brand dealerships
4  and authorized repair facilities were not properly repairing the defects to the 6.0-liter engine, and
5  knew that the limited work that FORD had authorized its dealerships to perform on those vehicles
6  would not properly repair them.

7      73.    When Plaintiffs took the Vehicle to AUBURN FORD for repairs, FORD and AUBURN
8  FORD continually represented that the repairs "fixed" the problems with Plaintiffs' 6.0-liter engine.
9  Plaintiffs relied on FORD, and its authorized repair facility, AUBURN FORD's, representations
10  that the repairs "fixed" the problems.

11     74.    It was not until February 28, 2017 when the engine in Plaintiffs' Vehicle required another
12  repair for similar problems after the express warranty had expired that Plaintiffs first discovered, or
13  reasonably could have discovered, that FORD's previous repairs to the engine during the express
14  warranty period had failed to conform Plaintiffs' Vehicle to the express warranty.  At this point,
15  Plaintiffs' Vehicle exhibited oil leak problems. Specifically, the hose and seals needed replacement
16  and oil was found in the valley of the engine.

17     75.    At that time, Plaintiffs first discovered or reasonably could have discovered that FORD
18  had misrepresented the engine quality and their ability to maintain the Vehicle under warranty, to
19  intentionally prevent Plaintiffs from discovering the irreparable non-conformities in the
20  Vehicle.  Plaintiffs could not have discovered this on an earlier date, despite a reasonable and
21  diligent investigation, because of FORD's fraudulent misrepresentations and concealment of the
22  defects in the 6.0-liter engine in Plaintiffs' Vehicle, as alleged in Paragraphs 16 through 56
23  above, and because of the repeated false assurances of FORD and its authorized dealership agents,
24  on which Plaintiffs reasonably relied, that FORD had repaired and would repair any problems with
25  the engine in Plaintiffs' Vehicle during the express warranty period.

26     76.    The statutes of limitation for each of Plaintiffs' claims against FORD were therefore tolled
27  under the delayed discovery rule and the doctrine of fraudulent concealment until Plaintiffs first
28  discovered in or around February 28, 2017 that FORD had failed to conform Plaintiffs' Vehicle to

-14-

1    the express warranty.

2    77.   Because FORD failed to disclose these foregoing facts to Plaintiffs, all statute of
3    limitations periods with respect to claims arising from the sale of the Vehicle were tolled by the
4    doctrines of fraudulent concealment, the discovery rule, and/or equitable tolling/estoppel.   As
5    alleged herein, FORD wrongfully concealed the facts (1) that FORD was equipping the trucks with
6    defective engines that FORD were unable or unwilling to repair, and (2) that FORD and its
7    authorized repair facilities, were making inadequate repairs that were incapable of addressing the
8    root cause of the trucks' malfunctions.

9    78.   Plaintiffs did not discover, and through the exercise of reasonable diligence could not have
10   discovered, the operative facts that are the basis of the claims alleged herein because the facts were
11   concealed in confidential and privileged documents, which a consumer would not know about and
12   could not obtain.

13   79.   No amount of diligence by Plaintiffs could have led to the discovery of these facts because
14   they were, and continue to be, kept secret by FORD, therefore, Plaintiffs were not at fault for failing
15   to discover these facts.

16   80.   Plaintiffs did not have actual knowledge of facts sufficient to put them on notice.  Plaintiffs
17   did not know, nor could they have known, about FORD's inability to repair the defects in 6.0-liter
18   diesel engines because, as alleged above, FORD kept this information highly confidential, and
19   FORD'S authorized repair dealership assured Plaintiffs that repairs were effective. FORD went
20   through great lengths to ensure that such information remained confidential as explained in detail
21   in Paragraphs 16 through 56 above.

22                    **ALL STATUTES OF LIMITATION**
23                    **ARE TOLLED BY EQUITABLE ESTOPPEL**

24   81.   FORD, and its authorized agents, made repeated representations to Plaintiffs that the
25   Vehicle was repaired.

26   82.   On August 11, 2007, Plaintiffs delivered their 2006 Ford F-350 to an authorized FORD
27   repair facility, because of an illuminated check engine light. FORD's authorized service personnel
28   attempted to repair the Vehicle by performing procedure to clean turbocharger. When the Vehicle

1   was returned to Plaintiffs. FORD's authorized service personnel represented to Plaintiffs that their

2   Vehicle was fixed. Plaintiffs reasonably relied on these representations.

3        83.    On July 26, 2015, Plaintiffs delivered their 2006 Ford F-350 to an authorized FORD repair

4   facility, because of an illuminated check engine light. FORD's authorized service personnel

5   attempted to repair the Vehicle by performing a procedure per TSB 09-16-05, and also cleaned the

6   intake manifold, replaced the exhaust gas recirculation valve and cooler, oil cooler and turbo. When

7   the Vehicle was returned to Plaintiffs. FORD's authorized service personnel represented to

8   Plaintiffs that their Vehicle was fixed and that "all [was] ok at this time". Plaintiffs reasonably

9   relied on these representations.

10       84.    On February 28, 2017, Plaintiffs delivered their 2006 Ford F- 350 to AUBURN FORD, an

11   authorized FORD repair facility, for its routine maintenance. FORD's authorized service personnel

12   diagnosed an oil leak and found that the hose and seals need to be replaced. FORD's authorized

13   service personnel also found oil in the valley of the engine. When the Vehicle was returned to

14   Plaintiffs. FORD's authorized service personnel represented to Plaintiffs that their Vehicle was

15   fixed. Plaintiffs reasonably relied on these representations.

16       85.    Plaintiffs were never informed by FORD or its authorized dealers, that the issues exhibited

17   by Plaintiffs' Vehicle during the warranty period were related to a known, widespread defect in the

18   engine. and that Plaintiffs' Vehicle exhibited different symptoms from the same underlying engine

19   defect. FORD went through great lengths to ensure that such information remained confidential.

20   and would not be disseminated to the public as explained in detail in Paragraphs 16 through 56

21   above.

22       86.    At all points at which FORD and its authorized agents, made representations about

23   Plaintiffs' Vehicle being repaired, Defendant and its authorized agents were aware that the repairs

24   performed on the Vehicle would not permanently repair the Vehicle and did not conform the

25   Vehicle with the terms of the warranties provided.

26       87.    Plaintiffs relied on Defendants' and their authorized agent's representations that the

27   Vehicle was repaired and that Defendants conformed the Vehicle to the terms of the warranties.

28   ///

88.   Plaintiffs were reasonable in their reliance on Defendant's representations about its ability to repair the Vehicle.

89.   Plaintiffs did not, and could not, know that Defendant was unable to repair the Vehicle because of Defendant's repeated misrepresentations about the sufficiency of the repairs performed.

## FIRST CAUSE OF ACTION

### Fraud in the Inducement - Intentional Misrepresentation

### (Against Defendant FORD Only)

90.   Plaintiffs' fraud-based claims in this cause of action arise from the following factual circumstances, by which FORD induced Plaintiffs to enter into a Retail Installment Sales Contract, attached hereto as **Exhibit 1**. That Retail Installment Sales Contract and the facts surrounding the inducement to enter into such are separate and apart from any breach of warranty allegations made herein, which are based on a separate contract – the written or implied warranty provided by FORD at the time of sale of the Vehicle and performed by FORD and its authorized repair facilities.

## DEFENDANTS' INTENTIONAL MISREPRESENTATIONS

## ABOUT THE VEHICLE AND ITS 6.0-LITER DIESEL ENGINE

91.   Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and realleged.

92.   As set forth in Paragraph 33 above, FORD distributed promotional materials representing that the 2006 Ford F-350 has the strength to handle the toughest assignments; that the 6.0-liter diesel engine is built "Ford tough;" that the 6.0-liter engine has "best-in-class torque" and "best-in-class diesel horsepower;" that "The all-new 32-valve 6.0 L Power Stroke V8 turbo diesel generates so much power that an entirely new automatic transmission has been developed to handle the increased loads;" that the 6.0-liter engine was reliable and well-made; that the 2006 Ford F-350 and other vehicles with this engine have superior towing capacity and capabilities; and that the 2006 Ford F-350, and its 6.0-liter engine, were high-quality products that were free from inherent defects.

93.   Plaintiffs also observed many television commercials advertising the new 2006 Ford F-350 as equipped with one of the best diesel engines.

///

-17-

94.   Prior to entering the sales contract to purchase the Vehicle, FORD made representations to Plaintiffs through printed marketing materials and through verbal representations by their authorized agents for communicating that information.

95.   Prior to Plaintiffs' decision to purchase the Vehicle, the sales personnel at FORD'S authorized dealership represented to Plaintiffs that the 2006 Ford F-350 had superior horsepower and torque.

96.   At all relevant times, FORD knew the 2006 Ford F-350 had severe and pervasive design, manufacturing, and quality defects, including defects in its 6.0-liter Navistar engine; that the 2006 Ford F-350 would exhibit defects that would prevent the Vehicle from being merchantable; that the defects would substantially impair the use, value, or safety of the Vehicle; and that the Vehicle's defects would not be repaired and eliminated under the applicable warranties.

97.   Prior to Plaintiffs' execution of the sales contract for purchase of the Vehicle, FORD was aware that the changes to the 6.0-liter engine that FORD had performed in its unsuccessful attempts to eliminate the inherent defects of the engine had drastically reduced the power of the engine, such that 2006 Ford F-350 vehicles equipped with the 6.0-liter engine did not meet the supposedly superior towing and hauling capabilities touted by FORD in its marketing brochures for the truck. FORD nevertheless continued to falsely state in the marketing brochures for the 2006 Ford F-350 they provided to customers, including Plaintiffs, that the 2006 Ford F-350 with the 6.0-liter engine had "the best in class towing capacities" that allowed a customer to "tow what you want, where you want," and that the truck "is ready to tow the heaviest loads with the greatest of ease."

98.   Plaintiffs also observed many television commercials advertising the new 2006 Ford F-350 as equipped with one of the best diesel engines.

99.   Prior to entering the sales contract to purchase the Vehicle, FORD made representations to Plaintiffs through printed marketing materials and through verbal representations by their authorized agents for communicating that information.

100.  Prior to Plaintiffs' decision to purchase the Vehicle, the sales personnel at FORD's authorized dealership represented to Plaintiffs that the 2006 Ford F-350 had superior horsepower and torque.

-18-

WITTINGER v. FORD COMPLAINT

## DEFENDANTS' INTENT AND PLAINTIFFS' RELIANCE
## ON DEFENDANTS' REPRESENTATIONS

101.  FORD, as alleged above, therefore intentionally made the foregoing misrepresentations of material facts to Plaintiffs concerning the qualities, attributes, and lack of defects of the 6.0-liter engine and the 2006 Ford F-350, including, but not limited to, false facts concerning the superior reliability and defect-free nature of the engine, the false fact that the engine is the best and most dependable diesel engine in its class, and false facts concerning the superior towing ability of the truck with the 6.0-liter engine, prior to Plaintiffs entering into the sales contract for purchase of the Vehicle, despite FORD's knowledge that these representations of material facts made to Plaintiffs concerning the qualities, attributes, and lack of defects of the engine and the 2006 Ford F-350 were false at the time they were made.

102.  Each of the foregoing misrepresentations of fact by FORD was, as alleged above, authorized and ratified by their respective officers, directors, and/or managers, including but not limited to Charlie Freese (FORD's Chief Engineer of Diesel Engines), Steve Henderson (FORD Executive), Frank Ligon (FORD's Director of Service Engineering Operations), and Michael Berardi (FORD's CBG Manager), and others, who had knowledge of the falsity of these foregoing misrepresentations of fact but who nevertheless authorized and ratified these foregoing misrepresentations of fact made to Plaintiffs.

103.  FORD intended that Plaintiffs rely on the foregoing representations that the 2006 Ford F-350 did not have inherent and irreparable defects, and that the 2006 Ford F-350 had superior towing capacities and capabilities, to induce Plaintiffs to buy the truck.

104.  Plaintiffs justifiably and reasonably relied on FORD's foregoing representations regarding the truck's lack of defects and its capabilities and qualities when deciding to purchase the Vehicle.

105.  Plaintiffs were harmed, in part or in whole, as a result of their reliance upon FORD's representations, as they purchased a vehicle they would not have otherwise purchased.

## HARM TO PLAINTIFFS AND DAMAGES

106.  Plaintiffs' reliance on FORD's representations was a substantial factor in causing them harm.

-19-

## PLAINTIFFS' VEHICLE SUFFERED FROM THE KNOWN DEFECTS

107. Subsequent to purchasing the Vehicle, Plaintiffs began experiencing problems with their Vehicle. Plaintiffs took their truck to FORD'S authorized repair facilities for engine repairs on several separate occasions because of numerous problems with the engine.

108. As the result of the repeated problems with Plaintiffs' Vehicle, in addition to other attempted repairs, FORD replaced many of the "usual suspects."

109. FORD knew that the repairs performed on Plaintiffs' Vehicle would not remedy the issues with Plaintiffs' Vehicle.

110. As a result of FORD's fraudulent acts, Plaintiffs seek rescission of the contract, restitution of all payments made towards the Vehicle, and damages in an amount to be determined at the time of trial.

111. As a result of FORD's fraudulent acts, Plaintiffs also suffered diminution in the value of their Vehicle, out-of-pocket expenses, and damages in the amount of the difference between the value of the Vehicle equipped with the defective engine and the value of the Vehicle if it had been equipped as warranted.

## FORD'S CONDUCT WAS REPREHENSIBLE

## AND WARRANTS AN AWARD OF PUNITIVE DAMAGES

112. FORD's conduct in employing these unfair and deceptive sales practices was malicious, willful, recklessly disregarded the harm to consumers, and was so reprehensible as to warrant the imposition of punitive damages.

113. In addition, FORD's deliberate failure to disclose the defects to the 6.0-liter engine was undertaken on a massive scale. Beginning in 2002 and continuing through the 2006 production year and beyond, FORD did not make any disclosures to consumers, through its dealerships or otherwise, regarding the engine defects in any of the model years for the "Super Duty" product line. Yet, by 2007, the 6.0-liter engine already had "unprecedented repair rates," according to Robert Fascetti, FORD's director of V-Engine and Diesel Engineering for the North American Engine Organization. In a sworn affidavit, Fascetti stated that repairs of the 6.0-liter engine had accounted for "approximately 80% of all of Ford's warranty spending on engines."

-20-

114. At the same time, FORD earned enormous profits as a result of its failure to disclose the defects. During the period that such vehicles were on the market, FORD's vehicles equipped with the 6.0-liter engine provided FORD with high gross profit margins. In addition, because engine replacements cost more than ten times the cost of the lesser repairs implemented by dealers, FORD profited enormously by refusing to authorize necessary major engine repairs or engine replacements during the warranty period, instead only authorizing less expensive services (such as cleanings or injector replacements), which were not adequate repairs and which would merely serve as a temporary measure until the problems resurfaced after the warranty expired.

115. The foregoing fraudulent and wrongful acts by FORD, as alleged above, were authorized and ratified by their respective officers, directors, and/or managers, including but not limited to Charlie Freese (FORD's Chief Engineer of Diesel Engines), Steve Henderson (FORD Executive), Frank Ligon (FORD's Director of Service Engineering Operations), and Michael Berardi (FORD's CBG Manager). FORD's agents or employees also committed the wrongful acts set forth above with the foregoing knowledge, authorization, approval, direction, or ratification of an officer, director, or managing agent of FORD pursuant to implicit or explicit company plans, schemes, or policies regarding the advertising and sale of Ford-brand trucks with 6.0-liter diesel engines. Alternatively, the aforementioned wrongful acts were committed by an officer, director, or managing agent of FORD.

116. Because of FORD's fraudulent acts, and because of the reprehensible nature and wide scale and profitability of FORD's conduct, an award of punitive damages is appropriate.

117. In committing the foregoing acts of fraud pursuant to their respective policies and procedures for selling vehicles equipped with Navistar 6.0-liter engines, FORD was guilty of oppression, fraud, and/or malice as the terms are defined in Civil Code section 3294.

## SECOND CAUSE OF ACTION

### Negligent Misrepresentation

### (Against Defendant FORD Only)

118. Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and realleged.

-21-

WITTINGER v. FORD COMPLAINT

119.  Plaintiffs' fraud-based claims in this cause of action arise from the foregoing and following factual circumstances, by which FORD induced Plaintiffs to enter into a Retail Installment Sales Contract, attached hereto as **Exhibit 1**.  That Retail Installment Sales Contract and the facts surrounding the inducement to enter into such are separate and apart from any breach of warranty allegations made herein, which are based on a separate contract – the written or implied warranty provided by FORD at the time of sale of the Vehicle.

120.  FORD, through their authorized employees and agents, represented to Plaintiffs that the 2006 Ford F-350's 6.0-liter diesel engine did not have inherent defects, that the Vehicle would be free from inherent defects, and that any defects with the Vehicle could be repaired under the applicable warranties.

121.  Although FORD may have honestly believed that the representation was true, FORD had no reasonable grounds for believing the representations were true when FORD made them.

122.  At the time of the sale of the Vehicle, FORD knew the 2006 Ford F-350 had inherent defects, including defects in its 6.0-liter Navistar engine; that the 2006 Ford F-350 would exhibit defects that would prevent the truck from being merchantable; that the 2006 Ford F-350 would exhibit defects that would substantially impair the use, value, or safety of the truck; and that the 2006 Ford F-350's defects could not be repaired and eliminated under the applicable warranties.

123.  The representations were made at the time of the sale of the Vehicle to Plaintiffs and throughout the warranty period.

124.  The foregoing defective condition of the 2006 Ford F-350 was known only to FORD, and Plaintiffs could not discover those defects and did not discover them until after years of using the Vehicle.

125.  FORD at all relevant times actively concealed the 2006 Ford F-350's known, inherent defects from the public, including Plaintiffs.

126.  FORD's representations were not true.

127.  FORD had no reasonable grounds for believing the representations were true when FORD made them.

///

-22-

WITTINGER v. FORD COMPLAINT

128.  FORD's misrepresentations were material to Plaintiffs' decision to buy the truck.  They would not have bought the 2006 Ford F-350 had they known the truth about the defects in the engine.

129.  FORD was negligent in making these representations, which induced Plaintiffs to buy the Vehicle.

130.  Plaintiffs reasonably relied on FORD's representations.

131.  Plaintiffs were harmed, in part or in whole, as a result of FORD's negligent misrepresentations.

132.  Plaintiffs' reliance was a substantial factor in causing their harm.

133.  As a result of FORD's fraudulent acts, Plaintiffs seek rescission of the contract, restitution of all payments made towards the Vehicle, and damages in an amount to be determined at the time of trial.

134.  As a result of FORD's fraudulent acts, Plaintiffs also suffered diminution in the value of their Vehicle, out-of-pocket expenses, and damages in the amount of the difference between the value of the Vehicle equipped with the defective engine and the value of the Vehicle if it had been equipped as warranted.

135.  FORD knew, or was negligent of the fact, that if it disclosed the 2006 Ford F-350's defects and their inability to repair them, Plaintiffs would not purchase the truck.

136.  Through the above-described deceitful tactics, FORD's negligent misrepresentation led Plaintiffs into purchasing a truck they would not have otherwise purchased.

137.  FORD had a pattern and practice of committing similar misrepresentations.

138.  In committing the above-described wrongful acts, FORD was guilty of oppression, fraud, or malice, because the acts were perpetrated pursuant to FORD's plans, schemes, or company policies to deceive, defraud, mislead, or take unfair advantage of buyers of Ford-brand trucks with 6.0-liter diesel engines.

139.  The foregoing fraudulent and wrongful acts, as alleged above, were authorized and ratified by FORD's officers, directors, and/or managers, including but not limited to Charlie Freese (FORD's Chief Engineer of Diesel Engines), Steve Henderson (FORD Executive), Frank Ligon

-23-

1   (FORD's Director of Service Engineering Operations), and Michael Berardi (FORD's CBG

2   Manager). FORD's agents or employees also committed the wrongful acts set forth above with the

3   foregoing knowledge, authorization, approval, direction, or ratification of an officer, director, or

4   managing agent of FORD pursuant to an implicit or explicit company plan, scheme, or policy

5   regarding the advertising and sale of Ford-brand trucks with 6.0-liter diesel engines. Alternatively,

6   the aforementioned wrongful acts were committed by an officer, director, or managing agent of

7   FORD.

## THIRD CAUSE OF ACTION

### Fraud in the Inducement – Concealment

### (Against Defendant FORD Only)

11   140.  Plaintiffs incorporate herein by reference each and every allegation contained in the

12   preceding and succeeding paragraphs as though herein fully restated and realleged.

13   141.  Plaintiffs' fraud-based claims in this cause of action arise from the foregoing and following

14   factual circumstances, by which FORD induced Plaintiffs to enter into a Retail Installment Sales

15   Contract, attached hereto as **Exhibit 1**.  That Retail Installment Sales Contract and the facts

16   surrounding the inducement to enter into such are separate and apart from any breach of warranty

17   allegations made herein, which are based on a separate contract – the written or implied warranty

18   provided by FORD at the time of sale of the Vehicle.

### FORD CONCEALED IMPORTANT FACTS

20   142.  FORD, through its authorized employees and agents, intentionally concealed the fact that

21   the 2006 Ford F-350 was equipped with a defective Navistar 6.0-liter diesel engine, which FORD

22   could not repair under its express written warranty, that the 2006 Ford F-350 would exhibit defects

23   that would prevent the truck from being merchantable, that the 2006 Ford F-350 would exhibit

24   defects that would substantially impair the use, value, or safety of the truck, and that the 2006 Ford

25   F-350's defects could not be repaired and eliminated under the applicable warranties.

26   143.  Information regarding these defects, which relate to the truck's reliability, cost to maintain,

27   value, and safety, is material to a reasonable consumer in deciding whether to purchase a vehicle.

28   ///

-24-

144. These facts were only known to FORD and Plaintiffs could not have discovered these facts.

145. FORD had a duty to disclose information on the 2006 Ford F-350 's defects, because it possessed exclusive and superior knowledge of the defects.

146. FORD actively concealed these important facts from Plaintiffs or prevented them from discovering these facts by failing to disclose the defects in any manner and by representing that the defects could be repaired, even though they knew the defects could never be repaired.

147. FORD was aware of the defects in the 6.0-liter Navistar diesel engine and owed a duty to disclose the defective properties of their products to Plaintiffs because FORD had exclusive and superior knowledge of material facts, to wit the defective properties of its products, which facts were not available to Plaintiffs.

148. FORD intentionally concealed the fact that the 6.0-liter Navistar diesel engine suffered from what FORD internally referred to as "the usual suspects," was irreparable, and did not have the towing capacity or the quality for which it was advertised.

149. The foregoing fraudulent concealment of facts were authorized and ratified by FORD's officers, directors, and/or managers, including but not limited to Charlie Freese (FORD's Chief Engineer of Diesel Engines), Steve Henderson (FORD Executive), Frank Ligon (FORD's Director of Service Engineering Operations), and Michael Berardi (FORD's CBG Manager), who had knowledge of the foregoing inherent and irreparable defects of the 6.0-liter engine in the 2006 Ford F-350, but who nevertheless authorized and ratified the concealment of these foregoing defects from consumers, including Plaintiffs.

150. Plaintiffs could not have discovered the concealed facts.

151. The concealed facts, had they been known to Plaintiffs, would have been material to Plaintiffs' decision to buy the truck, and if they would have known the concealed facts, they would not have bought the 2006 Ford F-350.

## DEFENDANTS' INTENT AND
## PLAINTIFFS' REASONABLE RELIANCE

152. FORD knew that if it disclosed the 2006 Ford F-350's inherent defects and its inability to repair them, Plaintiffs and other consumers would not purchase the 2006 Ford F-350 trucks.

-25-

WITTINGER v. FORD COMPLAINT

1  including the Vehicle.

2  153. Through the above-described deceitful tactics, Defendants tricked Plaintiffs into
3  purchasing a truck they would not have otherwise purchased.

4  154. FORD intended to deceive Plaintiffs by concealing the foregoing facts from Plaintiffs so
5  that they would purchase the 2006 Ford F-350, an irreparable, defective vehicle with lower towing
6  capacity and quality than advertised.

7  155. At the time of sale of the Vehicle, Plaintiffs reasonably relied on FORD's deception.

8  ## HARM TO PLAINTIFFS

9  156. Plaintiffs' reliance on concealment was a substantial factor in causing them harm.

10  157. As a result of FORD's fraudulent acts, Plaintiffs seek rescission of the contract, restitution
11  of all payments made towards the 2006 Ford F-350, and damages in an amount to be determined at
12  the time of trial.

13  158. As a result of FORD's fraudulent acts, Plaintiffs also suffered diminution in the value of
14  their Vehicle, out-of-pocket expenses, and damages in the amount of the difference between the
15  value of the Vehicle equipped with the defective engine and the value of the Vehicle if it had been
16  equipped as warranted.

17  159. In committing the foregoing acts of fraud pursuant to their respective policies and
18  procedures for selling vehicles equipped with Navistar 6.0-liter engines, FORD was guilty of
19  oppression, fraud, and/or malice as the terms are defined in Civil Code section 3294.

20  160. FORD has a pattern of committing similar acts of fraud on its consumers.

21  161. The foregoing fraudulent and wrongful acts were authorized and ratified by FORD's
22  respective officers, directors, and/or managers, including but not limited to Charlie Freese (FORD's
23  Chief Engineer of Diesel Engines), Steve Henderson (FORD Executive), Frank Ligon (FORD's
24  Director of Service Engineering Operations), and Michael Berardi (FORD's CBG Manager).
25  FORD's agents or employees also committed the wrongful acts set forth above with the foregoing
26  knowledge, authorization, approval, direction, or ratification of an officer, director, or managing
27  agent of FORD pursuant to implicit or explicit company plans, schemes, or policies regarding the
28  advertising and sale of Ford-brand trucks with 6.0-liter diesel engines.   Alternatively, the

-26-

1 aforementioned wrongful acts were committed by an officer, director, or managing agent of FORD.

2  162. Because of FORD's fraudulent acts, an award of punitive damages is appropriate.

3        **FOURTH CAUSE OF ACTION**

4  **Fraud in the Performance of Warranty Contract – Intentional Misrepresentation**

5        **(Against Defendant FORD Only)**

6  163. Plaintiffs incorporate herein by reference each and every allegation contained in the

7 preceding paragraphs as though herein fully restated and realleged.

8  164. From and after the time of Plaintiffs' purchase of the Vehicle, FORD's express written

9 warranty applied to the Vehicle, including the provisions of FORD's 6.0-liter Powerstroke Diesel

10 Engine Warranty which covered the "engine and engine components against defects in factory-

11 supplied materials or workmanship for five years after the warranty start date or 100,000 miles,

12 whichever occurs first," and which provided "[d]uring this coverage period, authorized Ford dealers

13 will repair, replace, or adjust all parts on your vehicle that are defective in factory-supplied materials

14 or workmanship."

15  165. The express warranty, including the 6.0-liter Powerstroke Diesel Engine Warranty, was a

16 separate contract from the sales contract and was made directly between FORD and Plaintiffs,

17 wherein FORD made the material representation of fact to Plaintiffs that FORD, through its

18 authorized dealers, would perform the warranty contract by repairing or otherwise eliminating all

19 defects in the 6.0-liter engine occurring during the warranty period, even if repairing or eliminating

20 the defects required the replacement of the entire engine or the entire vehicle.

21  166. As alleged more fully herein, FORD intentionally and fraudulently misrepresented

22 material facts in its 6.0-liter Powerstroke Diesel Engine Warranty by representing that FORD,

23 through its authorized dealers, would repair or otherwise eliminate all defects in the 6.0-liter engine

24 which occurred during the warranty period, because FORD knew before and at the time this

25 warranty was prepared by FORD and presented to Plaintiffs, that the 6.0-liter engine in the Vehicle

26 had serious inherent defects which FORD could not and would not repair or eliminate during the

27 express warranty period.

28 ///

167. At the time FORD provided the express warranty to Plaintiffs, and at all times thereafter, FORD knowingly had no intention to perform its contractual obligation to repair or eliminate the inherent defects of the 6.0-liter engine, of which FORD was aware during the warranty period. Instead, at the time this warranty was prepared and provided to Plaintiffs and at all times thereafter, FORD had an intentional policy and scheme in effect of refusing to authorize "major" repairs or replacements of 6.0-liter engines, even when necessary to repair or eliminate the inherent irreparable defects of the 6.0-liter engine.

168. Through this policy and scheme, FORD instructed its authorized dealers to only perform limited and knowingly ineffective repairs of the 6.0-liter engine, in order to save FORD millions of dollars in warranty expenses, and in order to leave consumers saddled with these inherently defective vehicles after their warranty periods expired, who would then be required to pay substantial out-of-pocket expenses in attempting to repair the persistent problems caused by the engine's inherent defects.

169. FORD thereby fraudulently performed its obligations under the express warranty between Plaintiffs and FORD. FORD's fraudulent performance of the warranty contract was carried out, in part, by FORD's fraudulent misrepresentations in the express warranty that FORD would repair or eliminate defects in the 6.0-liter engine, even if doing so required major repairs or replacement of the engine, or replacement of the vehicle. FORD's fraudulent performance of the warranty contract was also carried out, in part, by FORD's refusal to perform major repairs or replacement of the engine or Vehicle when FORD became aware of the presence of these inherent engine defects in the Plaintiffs' Vehicle, which FORD was well aware could not be repaired or eliminated by FORD during the warranty period.

170. FORD's warranty contract does not provide FORD a license to cheat or defraud Plaintiffs, because the State of California has a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices. (*See Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 991-993 ("economic loss rule" did not apply to fraud claims arising from intentional misrepresentations of fact related to the performance of a contract; *Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1238 ("economic loss

rule" did not apply to fraud claims arising from intentional misrepresentations concerning the defendant's intent to perform a contract, and stating: "Section 1710, subdivision (4), defines fraud as the making of a promise done without any intention of performing the obligation. A promise to do something necessarily implies the intention to perform, and where such an intention is absent, there is an implied misrepresentation of fact, which is actionable fraud").)

## FORD'S KNOWLEDGE OF IRREPARABLE DEFECTS
## OF THE 6.0-LITER ENGINE

171. As alleged in paragraphs 16 through 32 and 35 through 46 above, FORD's 6.0-liter engines have severe and pervasive design, manufacturing, and quality defects which have been known by FORD since 2002 and continuing thereafter.

172. The defects in the 6.0-liter engine caused FORD to delay the initial launch of the engine from an August 1, 2002 launch date until November 4, 2002.

173. On May 15, 2002, as FORD was planning production of the first 2004 vehicles equipped with the 6.0-liter engine, Charlie Freese, FORD's Chief Engineer of Diesel Engines, identified "multiple high risk items" with the 6.0-liter engine, which would delay the production start, including Injection Control Pressure Sensor (ICP) failures, piston failures, and injector failures which were "of particularly great concern." The problems were so serious that FORD considered extending production of the predecessor 7.3-liter engine, in place of the 6.0-liter engine.

174. On May 29, 2002, with the engine build kick-off just four days away, Freese identified additional "major issues" with the 6.0-liter engine, in addition to the ICP failures, piston failures, and injector failures. Those "new concerns" included, among others, problems with the head gaskets, turbo charger, the engine idle, and the injector driver module (IDM).

175. By August 23, 2002, FORD still was addressing injector defects causing idle problems, cold start problems, engine stall problems, and injector failures. Although Navistar sent engines with new process injectors to FORD, the durability tests for these engines were scheduled for completion the week of October 9, 2002, less than a month before production was to begin.

176. As the November 4, 2002 production date neared, problems with the 6.0-liter engine persisted; FORD was unable to determine their root cause. FORD decided it could not continue

-29-

delaying the launch, and instead began producing and selling the 2006 Ford F-350 equipped with the 6.0-liter engine, knowing its engine was defective.

177. On November 12, 2002, Steven Henderson, a FORD executive, wrote that FORD was "in the middle of the 6.0L launch, and … things are not going well." Although the launch was delayed a week, and the entire Navistar team was working full time, the problems were "not fully resolved yet."

178. Without remedying the defects, FORD continued to equip subsequent model years of the Excursion, including the 2003 model, with the 6.0-liter engine. Regardless of tweaks made to the 6.0-liter engine by FORD during subsequent model years, these same defects to the engine persisted throughout FORD's production and sale of the trucks.

179. At all relevant times, FORD knew the 2006 Ford F-350 had inherent defects, including defects in its 6.0-liter Navistar engine, that the 2006 Ford F-350 would exhibit defects that would prevent the truck from being merchantable, that the 2006 Ford F-350 would substantially impair the use, value, or safety of the truck, and that the 2006 Ford F-350's defects would not be repaired and eliminated under the applicable warranties.

180. Throughout FORD's production and sale of the engines, FORD never developed a repair plan in which FORD would comply with the above express warranties by identifying and eliminating the root cause of defects to the 6.0-liter engines. As detailed in the September 7, 2004 memorandum from Frank Ligon, FORD's Director of Service Engineering Operations, FORD did "not have a definitive repair action or production parts to properly address the concern universe." As revealed in an October 2004 email between FORD executives, FORD rejected pilot programs that would have had FORD technical experts assist dealerships with repairs.

181. Nor did FORD implement a formal recall program that would have required FORD to replace the defective engines. FORD executives had suggested that FORD authorize full and complete repairs of defective engines – essentially throwing the "kitchen sink" at the vehicle in order to help eliminate the need for subsequent repairs. However, in an email on October 8, 2004, Michael Berardi, FORD's CBG manager, said "[t]hat particular philosophy **is opposite of what we have been _training_ our dealers to do** and could lead to a very expensive warranty bill across

-30-

1  vehicle lines."

2      182. FORD instead instructed its authorized dealers to implement a Band-Aid strategy that
3  permitted the dealers to take only limited repair measures, such as cleaning or replacing individual
4  components, which did not properly remedy or resolve the underlying defect. This strategy and
5  scheme reduced FORD's warranty spending by millions of dollars, but did nothing to fix the
6  underlying root causes of the defects in the 6.0-liter engines.

7      183. In 2006, for example, among FORD's "6.0-liter Top Parts Warranty Actions" were new
8  procedures adopted to address "turbo coking" and "EGR coking," issues that had plagued the engine
9  since its inception. According to a July 2007 email between FORD executives, rather than replace
10  the coked turbo charger or EGR valve, FORD commenced a program in mid-2006 of simply
11  "cleaning" the parts in question, thus saving FORD a projected $9 million and $2.5 million in
12  warranty spending, respectively, on those two items.

13      184. These minor, limited measures merely addressed the symptoms. For example, the removal
14  of built up soot effectively concealed the seriousness and extent of the underlying root cause – poor
15  combustion. FORD's own study concluded that the cause was improper injector sealing and
16  associated leaks. Moreover, these measures misled customers, including Plaintiffs, to believe that
17  the underlying problem had been fixed, when in fact the symptom likely would reoccur on a later
18  date, possibly when the warranty would have expired, typically forcing the additional expenses to
19  be borne by the customer rather than by the dealer.

20      185. In FORD's own analysis of the multitude of warranty claims on the troubled 6.0-liter
21  engine, it concluded that the problems associated with the 6.0-liter engine were the result of "the
22  same root cause." As noted above, FORD had attributed the problems to "injector sealing issues."
23  Specifically, leaks between the fuel rail, combustion chamber, and coolant jacket. Despite having
24  this critical knowledge, FORD concealed it from consumers, and continuously treated the
25  symptoms rather than the underlying "root cause" of the problem.

26      186. On July 22, 2005, Chris Bolen, FORD's director of North America Powertrain
27  Manufacturing, wrote in a memorandum that the continuous problems with the quality of the 6.0-
28  liter engines were having "disastrous effects on this customer and segment."

-31-

WITTINGER v. FORD COMPLAINT

187. In June 2006, FORD engineers discovered that 6.0 -liter engines exceeded FORD's own cylinder pressure specifications for "normally" performing engines, prompting one engineer, Mike Frommann, to express concern in a June 2006 email that these specifications might be published or subpoenaed, and could cause FORD to "face a class action." *He therefore recommended that all emails discussing the issue be deleted.*

188. In addition, FORD has computer systems whereby it monitors warranty claims, communicates with its authorized dealers, and monitors the malfunctions and repair records of all these vehicles. These systems include MORS (Master Owner Relations System), AWS (Analytical Warranty System), and CQIS (Common Quality Indicator System).

189. Through these systems, FORD has detailed information regarding each time a vehicle is brought into a FORD-authorized dealership for repair, including but not limited to the symptoms that required the unit be brought in for service, the diagnosis of the problem, the repair authorized by FORD, and the work performed on the vehicle.

190. FORD accumulated a massive database through which it realized that the minor, limited work it was authorizing was inadequate to properly repair these defective engines, and major repairs, including engine replacement, were necessary to address these defects.

191. FORD continued its practice of only authorizing minor, ineffective repairs of these engine defects. FORD unfairly benefitted by this practice because FORD knew that after the warranty expired, the vehicle owner, rather than FORD, would have to pay for all future repairs.

192. FORD engineers referred to the failing parts as the "usual suspects." In a presentation dated July 10, 2007, FORD stated, "Causal parts are the usual suspects – Cylinder Head/Head Gasket. Engine Ass'y. EGR Cooler, EGR Valve."

## FORD'S INTENT AND PLAINTIFFS' RELIANCE
## ON FORD'S FALSE REPRESENTATIONS

193. As alleged in Paragraphs 16 through 32 and 35 through 46 above, from 2002 onward FORD knew of severe and pervasive design, manufacturing, and quality defects inherent in the 6.0-liter engine that could not be repaired or otherwise eliminated by FORD's authorized service dealers during the express warranty period.

-32-

194. FORD nevertheless made the false representations of material fact in FORD's 6.0-liter Powerstroke Diesel Engine Warranty that FORD, through its authorized service dealers, would repair or otherwise eliminate all defects in the 6.0-liter engine that occurred during the express warranty period.

195. FORD intended that owners of its vehicles, including Plaintiffs, would rely on the foregoing false representations of fact in its written warranty, and that such customers would erroneously believe and expect that FORD would be able to completely repair or otherwise eliminate all defects in the 6.0-liter engine during the express warranty period.

196. These false representations permitted FORD, as alleged in Paragraphs 35 through 46 above, to engage in an intentional and concerted policy and scheme of authorizing and performing only limited and knowingly ineffective repairs of the 6.0-liter engine during the warranty period, that FORD knew would not and could not eliminate the inherent and persistent defects of the engines. FORD specifically instructed its authorized dealers not to perform major repairs to the engines, or replacement of the entire engines, or replacement of the entire trucks.

197. FORD's concerted plan and scheme alleged above was intended to save, and indeed did save, millions of dollars in warranty repair expenses to FORD, and was also intended by FORD to leave customers, including Plaintiffs, saddled with inherently defective vehicles after their warranty periods expired. FORD knew and intended that these customers, including Plaintiffs, would be required to pay substantial out-of-pocket expenses for repairs of the inherently defective engines after the expiration of the warranty although FORD, according to its representations in the express warranty, should have repaired or replaced the engines at FORD's expense during the warranty periods.

198. The foregoing fraudulent misrepresentations of fact were made by FORD at the time of the sale of the Vehicle and continued throughout the warranty period.

199. FORD knew that the foregoing misrepresentations of fact were false at the times when they were made.

200. The fraudulent misrepresentations in FORD's 6.0-liter Powerstroke Diesel Engine Warranty, as alleged above, were authorized and ratified by FORD's officers, directors, and/or

-33-

1   managers, including but not limited to Charlie Freese (FORD's Chief Engineer of Diesel Engines).

2   Steve Henderson (FORD Executive), Frank Ligon (FORD's Director of Service Engineering

3   Operations), and Michael Berardi (FORD's CBG Manager), who had knowledge of the falsity of

4   these representations of fact but who nevertheless authorized and ratified these representations of

5   fact by FORD.

6      201.  Plaintiffs, at all material times, actually and reasonably relied on the foregoing false

7   representations of fact made by FORD in the 6.0-liter Powerstroke Diesel Engine Warranty that

8   FORD, through its authorized dealers, would perform the express warranty contract by repairing or

9   otherwise eliminating all defects in the 6.0-liter engine in the Vehicle that occurred during the

10  warranty period.

11     202.  In reliance on these foregoing false representations of fact, Plaintiffs reasonably believed

12  that repairs being performed on the Vehicle by FORD's authorized dealer during the warranty

13  period were intended to fully repair or eliminate the engine problems, and that the repairs would,

14  in fact, fully repair or eliminate the engine problems being experienced by Plaintiffs.

15  **HARM TO PLAINTIFFS AND DAMAGES FROM**

16  **FORD'S FRAUDULENT PERFORMANCE OF CONTRACT**

17     203.  The defective condition of the 6.0-liter diesel engine in the Vehicle was known only to

18  FORD, and Plaintiffs could not have discovered these defects through reasonable diligence, and, in

19  fact, and did not discover these defects until after several years of using the Vehicle.

20     204.  After purchasing the Vehicle, Plaintiffs began experiencing problems with their Excursion.

21  Plaintiffs took their truck to a FORD-authorized dealership for engine repairs on several separate

22  occasions because of numerous problems with the engine.

23     205.  The FORD authorized dealership attempted to repair the foregoing problems with the truck

24  on numerous occasions.  However, these repairs failed to permanently remedy the underlying root

25  defects of the truck's 6.0-liter engine, as alleged above, which persisted throughout the warranty

26  period for the engine and caused persistent engine problems, and which inherent engine defects

27  FORD knew at all material times, as alleged above, would not and could not be fully repaired or

28  eliminated by FORD's authorized dealer during the warranty period for the engine, despite FORD's

-34-

1   misrepresentations of fact made in FORD's warranty for the engine provided to Plaintiffs on which

2   they relied that all engine defects would be repaired or eliminated by FORD.

3       206.  These engine problems became so persistent that Plaintiffs were unable to use or rely on

4   the Vehicle.  Failure of the truck in its essential purpose was, and continues to be, extremely

5   frustrating and costly to Plaintiffs.  As a result of the persistent engine problems, Plaintiffs have

6   incurred significant out-of-pocket expenses for repairs and services to the engine, and have also

7   incurred other costs due to the engine problems.

8       207.  Plaintiffs have thereby been left as the owners of a 2006 Ford F-350 with persistent engine

9   defects that have not been and cannot be fully repaired or eliminated, and which FORD knew would

10  not be and could not be repaired or eliminated during the warranty period absent a replacement of

11  the engine and/or a replacement of the truck, which necessary replacement FORD refused to do

12  based on its policy and scheme alleged above.

13      208.  Plaintiffs were therefore harmed as a direct and proximate result of the fraudulent

14  misrepresentations of fact by FORD, and as a result of FORD's fraudulent performance of the

15  express warranty contract in knowingly and intentionally failing to repair or eliminate all defects

16  with the 6.0-liter engine in the Vehicle that occurred during the warranty period.

17      209.  Plaintiffs' reliance on FORD's foregoing fraudulent misrepresentations of fact, and

18  FORD's fraudulent performance of the express warranty contract, was therefore, as alleged above,

19  a substantial factor in causing them harm.

20      210.  As a result of FORD's foregoing fraudulent performance of the warranty contract,

21  Plaintiffs seek rescission of the sales contract for the purchase of the Vehicle, restitution of all

22  payments made towards the Vehicle, out-of-pocket expenses, and damages in an amount to be

23  determined at the time of trial.

24      211.  As a result of FORD's foregoing fraudulent performance of the contract, Plaintiffs have

25  also suffered diminution in the value of the Vehicle, and suffered damages in the amount of the

26  difference between the value of the Vehicle actually equipped with the defective engine and the

27  value of the Vehicle if it had been equipped as warranted.

28  ///

## FORD'S CONDUCT WAS REPREHENSIBLE
## AND WARRANTS AN AWARD OF PUNITIVE DAMAGES

212.   As previously alleged herein, FORD exhibited a pattern and practice from 2002 onward of fraudulently misrepresenting in FORD's 6.0-liter Powerstroke Diesel Engine Warranty for its 2006 Ford F-350, including for the Plaintiffs' Vehicle, that FORD, through its authorized dealers, would repair or eliminate all defects in the engine which occurred during the warranty period.  FORD made these foregoing false representations of fact in the warranty to its customers, including Plaintiffs, as alleged above, despite the fact that FORD knew at this time and thereafter that the inherent root defects of the 6.0-liter engine would not be repaired or eliminated during the warranty period absent major repairs or a replacement of the engine or the vehicle. FORD made these foregoing false representations of fact in the warranty to its customers, including Plaintiffs, despite the fact that FORD, as alleged above, had instructed its authorized dealers not to perform these major repairs or to replace the defective engines or the vehicles, but instead to only perform limited and ineffective repairs of the engines which FORD knew would not repair or eliminate these inherent defects of the engines. This fraudulent policy and scheme, as alleged above, was intended by FORD to save, and indeed did save FORD, millions of dollars in warranty repair expenses for the 6.0-liter engines of FORD's customers from 2002 onward, including Plaintiffs.  This fraudulent policy and scheme, as alleged above, was also intended by FORD to leave its customers, including Plaintiffs, saddled with FORD vehicles equipped with the inherently defective 6.0-liter engines, so these customers, including Plaintiffs, would thereafter be required to pay substantial out-of-pocket expenses for future repairs of the defective engines and vehicles, which FORD, according to the representations made in the warranty provided to FORD's customers, including Plaintiffs, should have rightly repaired or replaced at FORD's expense during the warranty period for these customers, including Plaintiffs.

213.   At the same time, FORD earned enormous profits as a result of its failure to repair or eliminate the defects of the 6.0-liter engine in the vehicles of unwary consumers who purchased FORD's vehicles without knowledge of the 6.0-liter engine's serious and irreparable inherent defects, and who relied on FORD's misrepresentations of fact made in the express warranty for the

-36-

WITTINGER v. FORD COMPLAINT

1   6.0-liter liter engine that FORD would repair or eliminate all defects of the engine which occurred
2   during the warranty period, including replacement of the engine or the vehicles if necessary to fully
3   repair or eliminate the engine's defects.  Indeed, during the period that trucks equipped with the
4   6.0-liter engine were on the market, this engine provided FORD with high gross profit margins.  In
5   addition, because engine replacements cost more than ten times the cost of the lesser and limited
6   ineffective repairs which FORD instructed its authorized dealers to perform, FORD profited
7   enormously by refusing to authorize necessary major engine repairs and/or engine replacements
8   during the warranty period, instead only authorizing less expensive services (such as cleanings or
9   injector replacements), which were not adequate repairs and which would merely serve as a
10  temporary measure until the problems resurfaced and continued after the warranty for the engine
11  expired.

12      214.  FORD's foregoing conduct in employing these unfair, fraudulent, and deceptive practices
13  was malicious, willful, recklessly disregarded the harm to consumers, including Plaintiff, and was
14  so reprehensible as to warrant the imposition of punitive damages.

15      215.  The foregoing fraudulent and wrongful acts by FORD, as alleged above, were authorized
16  and ratified by FORD's officers, directions, and/or mangers, including but not limited to Charlie
17  Freese (FORD's Chief Engineer of Diesel Engines), Steve Henderson (FORD Executive), Frank
18  Ligon (FORD's Director of Service Engineering Operations), and Michael Berardi (FORD's CBG
19  Manager).  FORD's agents or employees also committed the wrongful acts set forth above with the
20  foregoing knowledge, authorization, approval, direction, or ratification of an officer, director, or
21  managing agent of FORD pursuant to an implicit or explicit company plan, scheme, or policy
22  regarding the advertising and sale of Ford-brand trucks with 6.0-liter diesel engines. Alternatively,
23  the aforementioned wrongful acts were committed by an officer, director, or managing agent of
24  FORD.

25      216.  In committing the foregoing acts of fraud pursuant to FORD's policies and procedures,
26  FORD was guilty of oppression, fraud, and/or malice as the terms are defined in Civil Code section
27  3294. Because of FORD's foregoing fraudulent acts directed at Plaintiffs and other purchasing
28  consumers of FORD's vehicles with the 6.0 liter engine, and because of the reprehensible nature

and wide scale and profitability of FORD's conduct, an award of punitive damages is appropriate in this action.

## FIFTH CAUSE OF ACTION

### Song-Beverly Consumer Warranty Act

### (Against Defendant FORD Only)

217. Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

218. Express warranties accompanied the sale of the Vehicle to Plaintiffs by which FORD undertook to preserve or maintain the utility or performance of Plaintiffs' Vehicle or to provide compensation if there was a failure in such utility or performance.

219. The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to warranty and developed other serious defects and nonconformities to warranty.

220. Pursuant to the Song-Beverly Consumer Warranty Act (herein after the "Act") Civil Code sections 1790 *et seq.* the Vehicle constitutes "consumer goods" used primarily for family or household purposes, and Plaintiffs have used the Vehicle primarily for those purposes.

221. Plaintiffs are the "buyer" of consumer goods under the Act.

222. Defendant FORD is a "manufacturer" and/or "distributor" under the Act.

223. The foregoing defects and nonconformities to warranty manifested themselves within the applicable express warranty period. The nonconformities substantially impair the use, value and/or safety of the Vehicle.

224. Plaintiffs delivered the Vehicle to an authorized FORD repair facility for repair of the nonconformities.

225. FORD refused and/or failed to conform the Vehicle to, and/or honor, the applicable warranties after a reasonable number of repair attempts.

226. Defendant was unable to conform Plaintiffs' Vehicle to the applicable express after a reasonable number of repair attempts.

227. In order to meet the implied warranty of merchantability, consumer goods must meet each of the following criteria: (1) pass without objection in the trade under the contract description; (2)

-38-

1  are fit for the ordinary purposes for which such goods are used; (3) are adequately contained,

2  packaged, and labeled; and (4) conform to the promises or affirmations of fact made on the container

3  or label.

4       228. The implied warranty of merchantability has been breached, in that, among other matters,

5  the Vehicle suffered from defects and/or latent defects to its turbo charger systems, fuel injection

6  systems, head gasket, EGR valves, electrical systems, transmission systems, and cooling systems

7  and coolers plugging.

8       229. Plaintiffs are entitled to justifiably revoke their acceptance of the Vehicle under the Song-

9  Beverly Act.

10      230. Notwithstanding Plaintiffs' entitlement, Defendant FORD has failed to either promptly

11  replace the Vehicle or to promptly make restitution in accordance with the Song-Beverly Act.

12      231. Plaintiffs are entitled to and seek damages and other legal and equitable relief, including,

13  but not limited to, all incidental, consequential, and general damages resulting from FORD's failure

14  to comply with their obligations under the Song-Beverly Act.

15      232. Plaintiffs are entitled under the Song-Beverly Act to recover as part of the judgment a sum

16  equal to the aggregate amount of costs and expenses, including attorney's fees, reasonably incurred

17  in connection with the commencement and prosecution of this action.

18      233. Plaintiffs are entitled to, in addition to the amounts recovered, a civil penalty of up to two

19  times the amount of actual damages in that FORD willfully failed to comply with their

20  responsibilities under the Song-Beverly Act.

21                              **SIXTH CAUSE OF ACTION**

22                              **Consumers Legal Remedies Act**

23                              **(Against Defendant FORD Only)**

24      234. Plaintiffs incorporate herein by reference each and every allegation contained in the

25  preceding and succeeding paragraphs as though herein fully restated and realleged.

26      235. The Vehicle is a "good" as defined in Civil Code section 1761, subdivision (a).

27      236. FORD is subject to the Consumers Legal Remedies Act, Civil Code section 1750 *et seq.*,

28  as each is a "person" as defined in Civil Code section 1761, subdivision (c).

-39-

237. Plaintiffs, and each of them, are a "consumer" as defined in Civil Code section 1761, subdivision (d).

238. Vehicle Code section 11713, *et seq*. regulates the advertising and sale of motor vehicles.

239. In violation of the foregoing statutes, FORD has engaged in, and/or attempted to engage in, the following unfair methods of competition and unfair or deceptive acts or practices and these methods, acts, or practices were undertaken in a transaction intended to result or which resulted in the sale of goods or services to a consumer.

240. Plaintiffs relied on Ford's representations in purchasing the vehicle.

241. The following wrongful acts violate the following subdivisions of the CLRA: (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or he does not have; (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; (9) Advertising goods or services with intent not to sell them as advertised; (14) Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; (16) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not. (Civ. Code, § 1770, subd. (a).)

242. FORD represented that the 6.0-liter Navistar diesel engine in the Vehicle sold to Plaintiffs was the "longest-lasting diesel uses time-tested cast-iron architecture, for both the block and heads, to withstand the combustion pressures of peak diesel operation. A stiff bedplate enhances rigidity for smooth power. Electro-Hydraulic Direct Injection (EHDI), 4-valve induction, and electronic engine control optimize horsepower and torque." At the time FORD made this representation, it was aware of the fact that the defects in the 6.0-liter Navistar diesel engine prevented the engine from operating at optimal capacity, in turn causing the failures of several component parts of the engine. Those failures in engine parts diminished the towing capacity of the vehicle and necessitated frequent replacements of parts, with no permanent solution to the problems. FORD falsely represented that the vehicle was of a particular standard, quality, or grade in violation of the CLRA.

-40-

WITTINGER v. FORD COMPLAINT

243. FORD continued to advertise the 6.0-liter Navistar diesel engine as "top in its class," despite its knowledge of what Ford refers to as the "usual suspects" (irreparable defects) in the vehicle. FORD sold its defective 6.0-liter Navistar diesel engine with the knowledge that it failed to conform to the specifications for towing capacity and engine quality that it advertised in violation of the CLRA.

244. FORD represented to Plaintiffs that by entering into the Retail Installment Sales Contract to purchase the vehicle, Plaintiffs were securing the benefit of the warranties given by Ford Motor Company to maintain the utility and performance of the vehicle, or to provide compensation in the event of a failure in utility or performance. FORD was aware of its inability to repair the vehicle to conform to the specifications in the warranty. FORD represented that the sales transaction conferred an obligation that it did not, in violation of the CLRA.

245. Pursuant to the Consumer Legal Remedies Act, Civil Code section 1750 *et seq.*, on October 22, 2018, Plaintiffs notified FORD by certified mail, return receipt requested, of the alleged violations and demanded that FORD correct, repair, replace, or otherwise rectify the violations.

246. FORD failed to correct, repair, replace, or otherwise rectify the violations within 30 days of the date the above-referenced notification.

247. In committing the above wrongful acts, FORD was guilty of oppression, fraud, or malice, because the acts were perpetrated pursuant to FORD's plan, scheme, or company policy to deceive, defraud, mislead, or take unfair advantage of buyers of Ford-brand trucks with 6.0- liter diesel engines.

248. The foregoing fraudulent and wrongful acts by FORD, as alleged above, were authorized and ratified by FORD's officers, directors, and/or managers, including but not limited to Charlie Freese (FORD's Chief Engineer of Diesel Engines), Steve Henderson (FORD Executive), Frank Ligon (FORD's Director of Service Engineering Operations), and Michael Berardi (FORD's CBG Manager). FORD's agents or employees also committed the wrongful acts set forth above with the foregoing knowledge, authorization, approval, direction, or ratification of an officer, director, or managing agent of FORD pursuant to an implicit or explicit company plan, scheme, or policy regarding the advertising and sale of Ford-brand trucks with 6.0-liter diesel engines. Alternatively,

1   the aforementioned wrongful acts were committed by an officer, director, or managing agent of

2   FORD.

3       249. As a direct result of FORD's acts and/or omissions, Plaintiffs have been injured as set forth

4   herein.

5       250. Plaintiffs seek the entry of a preliminary and permanent injunction requiring FORD to

6   disclose fully, prior to the sale, the inherent engine defects in Ford-brand "Super-Duty" trucks

7   equipped with Navistar 6.0-liter engines and the defects buyers can expect to experience with these

8   trucks and desist from selling these trucks without the foregoing pre-sale disclosure. Also, Plaintiffs

9   seek an injunction issue to prevent FORD from refusing to authorize necessary major engine repairs

10  or replacements during the warranty period in favor of only authorizing less expensive services such

11  as cleanings or injector replacements which ultimately fail after the warranty expires.

12      251. Injunctive relief is necessary in this case because (1) the legal remedies are inadequate and

13  (2) the state has inherent power to halt deceptive conduct. Without injunctive relief, FORD will

14  continue to victimize California buyers of trucks with 6.0-liter engines. The repetition of FORD's

15  deceptive sales policies will result in irreparable harm. Without injunctive relief, FORD can simply

16  offer damages to the deceived customers who sue it in order to continue their deceptive practices.

17  Additionally, injunctive relief is specifically authorized by the Consumers Legal Remedies Act to

18  eradicate unfair and deceptive business practices.

19      252. The foregoing injunction is sought to protect the public from these predatory methods,

20  acts, or practices.

21      253. Plaintiffs seek actual damages pursuant to Civil Code section 1780.

22      254. Plaintiffs will amend the complaint to seek punitive damages pursuant to Civil Code

23  section 1780 if FORD does not comply with the requirements of the Consumer Legal Remedies Act.

24      255. An order requiring FORD to notify all consumers who were victimized is also sought,

25  which would require FORD to inform consumers of their deceptive practices.

26      256. Plaintiffs should be awarded costs, expenses, and attorney fees reasonably incurred in

27  connection with the award of injunctive relief.

28  ///

1    257. On behalf of Plaintiffs alone, equitable relief in the form of restitution/rescission is sought,

2    plus costs, expenses, and attorney fees reasonably incurred.

3    ## SEVENTH CAUSE OF ACTION

4    ### Negligent Repairs

5    ### (Against AUBURN FORD)

6    258. Plaintiffs incorporate herein by reference each and every allegation contained in the

7    preceding and succeeding paragraphs as though herein fully restated and re-alleged.

8    259. Plaintiffs delivered the Subject Vehicle to AUBURN FORD for repairs.

9    260. AUBURN FORD owed a duty to Plaintiffs to use ordinary care and skill in storage,

10   preparation and repair of the Vehicle in accordance with industry standards.

11   261. AUBURN FORD breached its duty to Plaintiffs to use ordinary care and skill by failing to

12   properly store, prepare and repair of the Vehicle in accordance with industry standards.

13   262. AUBURN FORD's negligent breach of its duties owed to Plaintiffs was a proximate cause

14   of Plaintiffs' damages.

15   ## PRAYER FOR RELIEF

16   WHEREFORE, Plaintiffs pray for judgment against FORD and AUBURN FORD as

17   applicable, as follows:

18   1.    For general, special and actual damages according to proof at trial;

19   2.    For rescission of the purchase contract and restitution of all monies expended;

20   3.    For diminution in value;

21   4.    For incidental and consequential damages according to proof at trial;

22   5.    For civil penalty in the amount of two times Plaintiffs' actual damages;

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

-43-

WITTINGER v. FORD COMPLAINT

1      6.    For prejudgment interest at the legal rate;

2      7.    For injunctive and equitable relief;

3      8.    For punitive damages pursuant to Civil Code section 3294;

4      9.    For reasonable attorney's fees and costs of suit; and

5      10.   For such other and further relief as the Court deems just and proper under the

6  circumstances.

7

8  Dated: November 13, 2018                         KNIGHT LAW GROUP, LLP

9

10                                      STEVE MIKHOV (SBN 224676)

11                                      AMY MORSE (SBN 290502)
                                    Attorneys for Plaintiffs,

12                                      KORI A. WITTINGER, and
                                    ALAN J. WITTINGER

13

14      Plaintiffs, KORI A. WITTINGER and ALAN J. WITTINGER, hereby demand trial by

15  jury in this action

16

17

18

19

20

21

22

23

24

25

26

27

28

-44-

# EXHIBIT 1

**SIMPLE INTEREST FINANCE CHARGE**

DEAL    2006972

Dealer Number _____   Contract Number _____   R.O.S. Number _____   Stock Number

| Buyer (and Co-Buyer) Name and Address (Including County and Zip Code) | Creditor - Seller (Name and Address) |
|---|---|
| KORI A WITTINGER | MAITA FORD MERCURY |
| Allen J Wittinger | |
| 8440 CHILI HILL RD | 1650 GRASS VALLEY HIGHWAY |
| NEWCASTLE   CA   PLACER   95658 | AUBURN, CA |
| | 95603 |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Creditor - Seller (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

| New Used | Year | Make and Model | Odometer | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|---|
| NEW | 2006 | FORD F350 PICKUP | 13 | 1FTWU31P58EC19134 | ☐ personal, family or household  ☐ business or commercial |

### FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $19378.51 |
|---|---|---|---|---|
| 9.39% | $ 9439.09(e) | $ 29902.47 | $ 39341.56(e) | $ 58719.03(e) |

(e) means an estimate

**YOUR PAYMENT SCHEDULE WILL BE:**

| Number of Payments: | Amount of Payments: | When Payments Are Due: |
|---|---|---|
| One Payment of | N/A | N/A |
| One Payment of | N/A | N/A |
| 71  Payments | 548.41 | Monthly, Beginning 06/07/200 |
| Payments | N/A | Monthly, Beginning N/A |
| One Final Payment   1 | 548.41 | 05/07/2012 |

Late Charge. If payment is not received in full within 10 days after it is due, you will pay a late charge of 5% of the part of the payment that is late.
Prepayment. If you pay off all your debt early, you may be charged a minimum finance charge.
Security Interest. You are giving a security interest in the vehicle being purchased.
Additional Information: See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date, minimum finance charges, and security interest.

**ITEMIZATION OF THE AMOUNT FINANCED**

1. Total Cash Price
   A. Cash Price of Motor Vehicle and Accessories _____ $ 42965.00 (A)
      1. Cash Price Vehicle   $ 42965.00
      2. Cash Price Accessories   $ _____ N/A
      3. Other (Nontaxable)
         Describe _____   $ _____ N/A
         Describe _____   $ _____ N/A
   B. Document Preparation Fee (not a governmental fee)   $ _____ 45.00 (B)
   C. Smog Fee Paid to Seller   $ _____ N/A (C)
   D. Sales Tax (on taxable items in A+B+C)   $ _____ 3118.23 (D)
   E. Optional DMV Electronic Filing Fee*   $ _____ N/A (E)
   F. (Optional) Service Contract*   $ _____ 2540.00 (F)
   G. (Optional) Service Contract* .:   $ _____ N/A (G)
   H. Prior Credit or Lease Balance paid by Seller to
      _____   $ _____ N/A (H)
      (see downpayment and trade-in calculation)
   I. (Optional) Gap Contract (to whom paid)* _____   $ _____ N/A (I)
   J. Other (to whom paid) _____   $ _____ N/A (J)
      For _____
   Total Cash Price (A through J)   $ 48668.23 (1)
2. Amounts Paid to Public Officials
   A. License Fees
   B. Registration/Tr...
   C. California Tire...
   D. Other _____
   E. Other _____
   Total Official Fees   $ _____ 610.75 (2)

### STATEMENT OF INSURANCE

NOTICE. No person is required as a condition of financing the purchase of a motor vehicle to purchase or negotiate any insurance through a particular insurance company, agent or broker. You are not required to buy any other insurance to obtain credit. Your decision to buy or not buy other insurance will not be a factor in the credit approval process.

**Vehicle Insurance**

| | | Term | Premium |
|---|---|---|---|
| $ N/A Ded. Comp., Fire & Theft | N/A Mos. | $ | |
| $ N/A Ded. Collision | N/A Mos. | $ | |
| Bodily Injury    $ N/A Limits | N/A Mos. | $ | |
| Property Damage $ N/A Limits | N/A Mos. | $ | |
| Medical N/A | N/A Mos. | $ | |
| N/A | N/A Mos. | $ | |

Total Vehicle Insurance Premiums   $ _____ (e)

UNLESS A CHARGE IS INCLUDED IN THIS AGREEMENT FOR PUBLIC LIABILITY OR PROPERTY DAMAGE INSURANCE, PAYMENT FOR SUCH COVERAGE IS NOT PROVIDED BY THIS AGREEMENT.

You may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit.

Buyer X _____
Co-Buyer X _____
Seller X MAITA FORD MERCUR :

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

**Application for Optional Credit Insurance**

☐ Credit Life:   ☐ Buyer   ☐ Co-Buyer   ☐ Both
☐ Credit Disability (Buyer Only)

| | Term | Exp. | Premium |
|---|---|---|---|
| Credit Life | N/A Mos. | N/A /$ | (a) |
| Credit Disability | N/A Mos. | N/A /$ | (a) |

Total Credit Insurance Premiums   $ _____ N/A (b)
Insurance Company Name _____ N/A

Home Office Address _____

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit life and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown above.

You are applying for the credit insurance marked above. Your signature below means that you agree that: (1) You are not eligible for insurance if you have reached your 65th birthday. (2) You are eligible for disability insurance only if you are working for wages or profit 30 hours a week or more on the Effective Date. (3) Only the Primary Buyer is eligible for disability insurance. DISABILITY INSURANCE MAY

B. Registration/Transfer/Titling Fees
C. California Tire Fees* ............................. $    8.75 (C)
D. Other _____ $    N/A (D)
E. Other _____ , $    N/A (E)
Total Official Fees (A through E) ................... $    610.75 (2)

3. Amount Paid to Insurance Companies
(Total premiums from Statement of Insurance column a + b)* .... $    N/A (3)
4. Smog Certification or Exemption Fee Paid to State ............... $    N/A (4)
5. Subtotal (1 through 4) ............................. $   49278.90 (5)
6. Total Downpayment
   A. Agreed Trade-In Value  Yr  N/A  Make  N/A  $    N/A (A)
    Model  N/A   Odom. _____
    VIN _____
   B. Less Prior Credit or Lease Balance ............... $    N/A (B)
   C. Net Trade-In (A less B) (Indicate if a negative number) ... $    N/A (C)
   D. Deferred Downpayment ............... $    N/A (D)
   E. Manufacturer's Rebate ............... $   3000.00 (E)
   F. Other ............... $    N/A (F)
   G. Cash ............... $   16376.51 (G)
   Total Downpayment (C through G) ............... $   19376.51 (6)
   (If negative, enter zero on line 6 and enter the amount less than zero as a positive number on line 1H above)
7. Amount Financed (5 less 6) ............... $   29902.47 (7)
*Seller may keep part of these amounts.

---

**SELLER ASSISTED LOAN**
BUYER MAY BE REQUIRED TO PLEDGE SECURITY FOR THE LOAN, AND WILL BE OBLIGATED FOR THE INSTALLMENT PAYMENTS ON BOTH THIS RETAIL INSTALLMENT SALE CONTRACT AND LOAN.
N/A
Proceeds of Loan From: _____
Amount $ _____ Finance Charge $ _____ N/A
Total $ _____ N/A Payable In _____ N/A
Installments of $ _____ N/A _____
from this Loan is shown in Item 6D.

**AUTO BROKER FEE DISCLOSURE**
If this contract reflects the retail sale of a new motor vehicle, the sale is not subject to a fee received by an autobroker from us unless the following box is checked:
☐ Name of autobroker receiving fee, if applicable.

---

**NOTICE OF RESCISSION RIGHTS**
If Buyer and Co-Buyer sign here, the provisions of the Rescission Rights section on the back giving the Seller the right to rescind if Seller is unable to assign this contract to a financial institution will apply.
Buyer X _Keri A. Wittinger_   Co-Buyer X _Alan Q. Wittinger_

OPTION: ☐ You pay no finance charge if the Amount Financed, Item 7, is paid in full on or before _____ Year _____ SELLER'S INITIALS _____

THE MINIMUM PUBLIC LIABILITY INSURANCE LIMITS PROVIDED IN LAW MUST BE MET BY EVERY PERSON WHO PURCHASES A VEHICLE. IF YOU ARE UNSURE WHETHER O NOT YOUR CURRENT INSURANCE POLICY WILL COVER YOUR NEWLY ACQUIRED VEHICLE IN THE EVENT OF AN ACCIDENT, YOU SHOULD CONTACT YOUR INSURANCE AGENT.
WARNING:
YOUR PRESENT POLICY MAY NOT COVER COLLISION DAMAGE OR MAY NOT PROVIDE FOR FULL REPLACEMENT COSTS FOR THE VEHICLE BEING PURCHASED. IF YOU D NOT HAVE FULL COVERAGE, SUPPLEMENTAL COVERAGE FOR COLLISION DAMAGE MAY BE AVAILABLE TO YOU THROUGH YOUR INSURANCE AGENT OR THROUGH THE SELLIN DEALER. HOWEVER, UNLESS OTHERWISE SPECIFIED, THE COVERAGE YOU OBTAIN THROUGH THE DEALER PROTECTS ONLY THE DEALER, USUALLY UP TO THE AMOUNT O THE UNPAID BALANCE REMAINING AFTER THE VEHICLE HAS BEEN REPOSSESSED AND SOLD. FOR ADVICE ON FULL COVERAGE THAT WILL PROTECT YOU IN THE EVENT OF LOSS OR DAMAGE TO YOUR VEHICLE, YOU SHOULD CONTACT YOUR INSURANCE AGENT.
THE BUYER SHALL SIGN TO ACKNOWLEDGE THAT HE/SHE UNDERSTANDS THESE PUBLIC LIABILITY TERMS AND CONDITIONS.
S/S X _Keri A. Wittinger_   X _____

**Representations of Buyer:** Seller has relied on the truth and accuracy of the information provided by you in connection with the Trade-In Vehicle. You represent that you have given a true payoff amount on the vehicle traded in. If the payoff amount is more than the amount shown above, in Item 6B as a "Prior Credit or Lease Balance" you agree to pay us the difference on demand. If the payoff is less than the amount shown, we will...
Buyer X _Keri A. Wittinger_   Co-Buyer X _Alan Q. Wittinger_

**Notice to buyer:**
(1) Do not sign this agreement before you read it or if it contains any blank spaces to be filled in. (2) You are entitled to a completely filled in copy of this agreement. (3) You can prepay the full amount due under this agreement at any time. (4) If you default in the performanc of your obligations under this agreement, the vehicle may be repossessed and you may be subject to suit and liability for the unpai indebtedness evidenced by this agreement.

If you have a complaint concerning this sale, you should try to resolve it with the seller.
Complaints concerning unfair or deceptive practices or methods by the seller may be referred to the city attorney, the district attorney, or an investigator for the Departme of Motor Vehicles, or any combination thereof.
After this contract is signed, the seller may not change the financing or payment terms unless you agree in writing to the change. You do not have to agree to any chang and it is an unfair or deceptive practice for the seller to make a unilateral change.
Buyer Signature X _Keri A. Wittinger_   Co-Buyer Signature X _Alan Q. Wittinger_

**The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contra and retain its right to receive a part of the Finance Charge.**

**THERE IS NO COOLING OFF PERIOD**

---

that: (1) You are not eligible for insurance if you ha reached your 65th birthday. (2) You are eligible disability insurance only if you are working for wag or profit 30 hours a week or more on the Effectiv Date. (3) Only the Primary Buyer is eligible disability insurance. DISABILITY INSURANCE M NOT COVER CONDITIONS FOR WHICH YOU HAV SEEN A DOCTOR OR CHIROPRACTOR IN TH LAST 6 MONTHS (Refer to "Total Disabilities N Covered" in your policy for details).
You want to buy the credit insurance.

04/23/06 X _Keri A. Wittinger_ ___ Ag
Date    Buyer Signature

____ X _Alan Q. Wittinger_ ___ Ag
Date    Co-Buyer Signature

**OPTIONAL GAP CONTRACT** A gap contract (debt cance tion contract) is not required to obtain credit and will not provided unless you sign below and agree to pay the e charge. If you choose to buy a gap contract, the charge is sho in Item 11. See your gap contract for details on the protec it provides, it is a part of this contract.
Term   N/A   Mos _____ Name of Gap Contract
You want to buy a gap contract.
Buyer X _____

**OPTIONAL SERVICE CONTRACT(S)** You want purchase the service contract(s) written with the follow company(ies) for the term(s) shown below for the charge shown in Item 1.F and/or 1.G above.
1.F Company _Ford Maint_
Term _(4)_ ____ Mos. or _25000_ Mil
1.G Company   N/A
Term   N/A   Mos. or   N/A   Mil
Buyer X _Keri A. Wittinger_

**HOW THIS CONTRACT CAN BE CHANGED.** Th contract contains the entire agreement between you a us relating to this contract. Any change to the contract mu be in writing and both you and we must sign it. No o changes are binding.
X _Keri A. Wittinger_
Buyer Signs
X _Alan Q. Wittinger_
Co-Buyer Signs

---

YOU AGREE TO THE TERMS OF THIS CONTRACT. YOU CONFIRM TH BEFORE YOU SIGNED THIS CONTRACT, WE GAVE IT TO YOU, AND YOU WE...

Amount Financed (5 less 6) ............................ (7)

Buyer X _____

Seller may keep part of those amounts.

**AUTO BROKER FEE DISCLOSURE**
If this contract reflects the retail sale of a new motor vehicle, the sale is not subject to a fee received by an autobroker from us unless the following box is checked:
☐ Name of autobroker receiving fee, if applicable:

THROUGH, SELLER ASSISTED LOAN
BUYER MAY BE REQUIRED TO PLEDGE SECURITY FOR THE LOAN, AND
WILL BE LIABLE FOR THE INSTALLMENT PAYMENTS ON BOTH THE
RETAIL INSTALLMENT SALE CONTRACT AND THE LOAN.

Proceeds of Loan From:         N/A
Amount $  N/A ___ Finance Charge $  N/A
Total $ ___ N/A ___ Payable In  N/A
Installments of $ _____ $ _____
from this Loan is shown in Item 6D.

**OPTIONAL SERVICE CONTRACT(S)** You want to purchase the service contract(s) written with the following company(ies) for the term(s) shown below for the charge(s) shown in Item 1.F and/or 1.G above.

1.F Company _____
Term ___ Mos. or ___ Miles
1.G Company ___ N/A ___
Term ___ Mos. or  N/A  Miles
Buyer X _____

**NOTICE OF RESCISSION RIGHTS**
If Buyer and Co-Buyer sign here, the provisions of the Rescission Rights section on the back giving the Seller the right to rescind if Seller is unable to assign this contract to a financial institution will apply.

Buyer X _____   Co-Buyer X _____

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be in writing and both you and we must sign it. No oral changes are binding.

X _____
Buyer Signs
X _____
Co-Buyer Signs

**OPTION:** ☐ You pay no finance charge if the Amount Financed, Item 7, is paid in full on or before _____, Year _____ SELLER'S INITIALS _____

THE MINIMUM PUBLIC LIABILITY INSURANCE LIMITS PROVIDED IN LAW MUST BE MET BY EVERY PERSON WHO PURCHASES A VEHICLE. IF YOU ARE UNSURE WHETHER OR
NOT YOUR CURRENT INSURANCE POLICY WILL COVER YOUR NEWLY ACQUIRED VEHICLE IN THE EVENT OF AN ACCIDENT, YOU SHOULD CONTACT YOUR INSURANCE AGENT.
WARNING:
YOUR PRESENT POLICY MAY NOT COVER COLLISION DAMAGE OR MAY NOT PROVIDE FOR FULL REPLACEMENT COSTS FOR THE VEHICLE BEING PURCHASED. IF YOU DO
NOT HAVE FULL COVERAGE, SUPPLEMENTAL COVERAGE FOR COLLISION DAMAGE MAY BE AVAILABLE TO YOU THROUGH YOUR INSURANCE AGENT OR THROUGH THE SELLING
DEALER. HOWEVER, UNLESS OTHERWISE SPECIFIED, THE COVERAGE YOU OBTAIN THROUGH THE DEALER PROTECTS ONLY THE DEALER, USUALLY UP TO THE AMOUNT
OF THE UNPAID BALANCE REMAINING AFTER THE VEHICLE HAS BEEN REPOSSESSED AND SOLD.
FOR ADVICE ON FULL COVERAGE THAT WILL PROTECT YOU IN THE EVENT OF LOSS OR DAMAGE TO YOUR VEHICLE, YOU SHOULD CONTACT YOUR INSURANCE AGENT.
THE BUYER SHALL SIGN TO ACKNOWLEDGE THAT HE/SHE UNDERSTANDS THESE PUBLIC LIABILITY TERMS AND CONDITIONS.

S/S X _____   X _____

**Representations of Buyer:** Seller has relied on the truth and accuracy of the information provided by you in connection with the Trade-In Vehicle.
You represent that you have given a true payoff amount on the vehicle traded in. If the payoff amount is more than the amount shown above in Item
6.B as "Prior Credit or Lease Balance," you must pay Seller the excess on demand. If the payoff amount is less than the amount shown above in
Item 6.B as "Prior Credit or Lease Balance," Seller _____

Buyer X _____   Co-Buyer X _____

**Notice to Buyer:**
(1) Do not sign this agreement before you read it or if it contains any blank spaces to be filled in. (2) You are entitled to a completely filled in copy of this agreement. (3) You can prepay the full amount due under this agreement at any time. (4) If you default in the performance of your obligations under this agreement, the vehicle may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.

If you have a complaint concerning this sale, you should try to resolve it with the seller.
Complaints concerning unfair or deceptive practices or methods by the seller may be referred to the city attorney, the district attorney, or an investigator for the Department of Motor Vehicles, or any combination thereof.
After this contract is signed, the seller may not change the financing or payment terms unless you agree in writing to the change. You do not have to agree to any change, and it is an unfair or deceptive practice for the seller to make a unilateral change.

Buyer Signature X _____   Co-Buyer Signature X _____

**The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.**

**THERE IS NO COOLING OFF PERIOD**
California law does not provide for a "cooling off" or other cancellation period for vehicle sales. Therefore, you cannot later cancel this contract simply because you change your mind, decide the vehicle costs too much, or wish you had acquired a different vehicle. After you sign below, you may only cancel this contract with the agreement of the seller or for legal cause, such as fraud.

Buyer Signature X _____ Date _____   Co-Buyer Signature X _____ Date _____

YOU AGREE TO THE TERMS OF THIS CONTRACT. YOU CONFIRM THAT BEFORE YOU SIGNED THIS CONTRACT, WE GAVE IT TO YOU, AND YOU WERE FREE TO TAKE IT AND REVIEW IT. YOU ACKNOWLEDGE THAT YOU HAVE READ BOTH SIDES OF THIS CONTRACT, INCLUDING THE ARBITRATION CLAUSE ON THE REVERSE SIDE, BEFORE SIGNING BELOW. YOU CONFIRM THAT YOU RECEIVED A COMPLETELY FILLED IN COPY WHEN YOU SIGNED.

Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the terms of this contract and to any changes in the contract.

**GUARANTY**

_____ Date _____

_____ Date _____

Guarantor Address _____

Seller Signs _____ Date _____ By X _____ Title _____

**LAW®** FORM NO. 553-CA-ARB (REV 10/01) U.S. PATENT NO D423,722
©2001 Reynolds and Reynolds TO ORDER: www.reysource.com; 1-800-344-0996; fax 1-800-531-9055
THE PRINTER MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO CONTENT OR
FITNESS FOR PURPOSE OF THIS FORM. CONSULT YOUR OWN LEGAL COUNSEL.

CUSTOMER / TRUTH IN LENDING COPY

**COPY**

CM-010

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number and address)*:<br>Steve Mikhov (SBN 224676)/Amy Morse (SBN 290502)<br>Knight Law Group, LLP<br>10250 Constellation Blvd., Suite 2500, Los Angeles, CA 90067<br>TELEPHONE NO: (310) 552-2250    FAX NO: (310) 552-7973<br>ATTORNEY FOR *(Name)*: KORI A. WITTINGER and ALAN J. WITTINGER | **FOR COURT USE ONLY**<br><br>F I L E D<br>Superior Court of California<br>County of Placer<br><br>NOV 14 2018<br><br>Jake Chatters<br>Executive Officer & Clerk<br>By: S. Hubbard, Deputy |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Placer
STREET ADDRESS: 10820 Justice Center Drive
MAILING ADDRESS: Same
CITY AND ZIP CODE: Roseville, CA 95678
BRANCH NAME: Bill Santucci Justice Center

**CASE NAME:** KORI A. WITTINGER and ALAN J. WITTINGER
v. FORD MOTOR COMPANY, a Delaware Corporation, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER |
|---|---|---|---|---|
| [X] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | **SCV 0042126** |
| | | | | JUDGE |
| | | | | DEPT |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[X] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a.[X] monetary   b.[X] nonmonetary; declaratory or injunctive relief   c.[X] punitive
4. Number of causes of action *(specify)*: 7
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 11/13/18

Steve Mikhov
_____
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

*(margin text)* BY FAX

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) *(if the
  case involves an uninsured
  motorist claim subject to
  arbitration, check this item
  instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability *(not asbestos or
  toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) *(not civil
  harassment)* (08)
Defamation (e.g., slander, libel)
  (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    *(not medical or legal)*
  Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract *(not unlawful detainer
    or wrongful eviction)*
  Contract/Warranty Breach–Seller
    Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage *(not provisionally
  complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent
    domain, landlord/tenant, or
    foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
  drugs, check this item; otherwise,
  report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  *(arising from provisionally complex
  case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of
    County)
  Confession of Judgment *(non-
    domestic relations)*
  Sister State Judgment
  Administrative Agency Award
    *(not unpaid taxes)*
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
  above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-
    harassment)*
  Mechanics Lien
  Other Commercial Complaint
    Case *(non-tort/non-complex)*
  Other Civil Complaint
    *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition *(not specified
  above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
    Claim
  Other Civil Petition

# Superior Court of the State of California
## In and For The County of Placer

CASE NO. **S C V   0 0 4 2 1 2 6**

## A CASE MANAGEMENT CONFERENCE HAS BEEN SCHEDULED:

DATE:   March 19, 2019
TIME:   ☒10:00 A.M. If your case number starts with "S-CV"
        ☐10:30 A.M. If your case number starts with "S-CV" and is deemed Complex
        ☐11:00 A.M. If your case number starts with "M-CV"
DEPT:   40 - 10820 Justice Center Drive, Roseville, California

## IF YOU DO NOT HAVE AN ATTORNEY, READ THIS:

The judge does **not** decide whether you win or lose your case at this court date. If you do not file an "Answer," or other "responsive pleading," you will automatically lose this case, usually before this court date. The Answer or responsive pleading must be given to the court clerk within 30 days of the day you received the Summons, along with a filing fee or application for waiver of court fees.

You can get free help filling out your Answer or responsive pleading at the court's Legal Help Center. For more information or to schedule an appointment, go to the court's website at www.placer.courts.ca.gov and select "Legal Help Center."

## INFORMATION ABOUT CASE MANAGEMENT CONFERENCES:

15 calendar days before the Case Management Conference, you must file and serve a completed Case Management Statement (CM-110).

You do not need to come to court for the first Case Management Conference. You can see the court's proposed orders 12 calendar days before the Case Management Conference on the court's website, www.placer.courts.ca.gov. Select "Tentative Rulings and Calendar Notes," then "Civil Case Management Conference." If you do not have Internet access, call the court at 916-408-6000 to get the information.

The court does not provide a court reporter at Case Management Conferences or Law & Motion hearings. If you want the proceedings reported, you must provide your own court reporter at your own expense.

IF YOU WANT TO APPEAR BY TELEPHONE, you must schedule your telephonic appearance through the court's website, www.placer.courts.ca.gov. Select "Telephonic Appearance System." For more information on the telephonic appearance system, please visit our "How to" guide on the website. YOU MUST PAY ONLINE TO USE THIS SERVICE UNLESS YOU HAVE BEEN GRANTED A FEE WAIVER BY THE COURT.

COPY

KNIGHT LAW GROUP, LLP
Steve Mikhov (SBN 224676)
stevem@knightlaw.com
Amy Morse (SBN 290502)
amym@knightlaw.com
10250 Constellation Blvd., Suite 2500
Los Angeles, CA 90067
Telephone: (310) 552-2250
Fax: (310) 552-7973

Attorneys for Plaintiffs,
KORI A. WITTINGER and
ALAN J. WITTINGER

FILED
Superior Court of California
County of Placer

1   14 2018

Jake Chatters
Executive Officer & Clerk
By: S. Hubbard, Deputy

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF PLACER

|  |  |
|---|---|
| KORI A. WITTINGER and ALAN J. WITTINGER, <br><br> Plaintiffs, <br><br> vs. <br><br> FORD MOTOR COMPANY, a Delaware Corporation, <br><br> Defendant. | Case No.: <br> Unlimited Jurisdiction <br><br> **VENUE DECLARATION FOR CONSUMERS LEGAL REMEDIES ACT CLAIM** <br><br> *Assigned For All Purposes To* <br> *Hon.* _____ <br><br> Dept.: |

SCV 0042126

I, Kori A. Wittinger, declare as follows:

1.   I am the Plaintiff in this action and make this declaration to the best of my knowledge, information and belief of the facts stated herein.

2.   I purchased a new 2006 Ford F-350, VIN: VIN # 1FTWW31P56EC19134 ("Vehicle"), from Maita Ford, which was in the City of Auburn, County of Placer, State of

-1-

Venue Declaration for Consumers Legal Remedies Act

1    California.

2    3. The Complaint that will be filed in this matter contains a cause of action for violation of

3    the Consumers Legal Remedies Act.

4    4. Defendant FORD MOTOR COMPANY is and was a Delaware Corporation registered to

5    do business in the State of California, and at all times relevant hereto was engaged in conducting

6    business in Los Angeles County with its agent for service in process in Los Angeles.

7    5. The acts, practices, policies, and procedures which form the basis of this action, or a

8    substantial portion thereof, occurred in Placer County, and at the location of Defendant FORD

9    MOTOR COMPANY's principle place of business in the City of Auburn, County of Placer, State

10   of California.

11   6. In compliance with Civil Code, section 1780, subdivision (c), this cause of action has been

12   properly commenced in the proper county or judicial district for trial.

13   I declare under penalty of perjury under the laws of the State of California that the

14   foregoing is true and correct and was executed by me in Newcastle, California, on

15   10/29/2018

16

17   _kori Wittinger_

18   KORI A. WITTINGER

19

20

21

22

23

24

25

26

27

28

-2-

Venue Declaration for Consumers Legal Remedies Act

COPY
FILED
Superior Court of California
County of Placer

MAY 14 2018

Jake Chatters
Executive Officer & Clerk
By: S. Hubbard, Deputy

1  KNIGHT LAW GROUP, LLP
2  Steve Mikhov (SBN 224676)
   stevem@knightlaw.com
3  Amy Morse (SBN 290502)
   amym@knightlaw.com
4  10250 Constellation Blvd., Suite 2500
5  Los Angeles, CA 90067
   Telephone: (310) 552-2250
6  Fax: (310) 552-7973

7  Attorneys for Plaintiffs,
   KORI A. WITTINGER and
8  ALAN J. WITTINGER

9

10

11              SUPERIOR COURT OF CALIFORNIA

12                    COUNTY OF PLACER

13

14  KORI A. WITTINGER and           Case No. SCV   0 0 4 2 1 2 6
    ALAN J. WITTINGER,              Unlimited Jurisdiction
15
                                    BY FAX
16          Plaintiffs,
                                    VENUE DECLARATION FOR
17     vs.                          CONSUMERS LEGAL REMEDIES
                                    ACT CLAIM
18
    FORD MOTOR COMPANY, a Delaware  *Assigned For All Purposes To*
19  Corporation,                    *Hon. _____*
20
                                    Dept.:
21          Defendant.
22
23
24  I, Alan J. Wittinger, declare as follows:
25     1.  I am the Plaintiff in this action and make this declaration to the best of my knowledge,
26  information and belief of the facts stated herein.
27     2.  I purchased a new 2006 Ford F-350, VIN: VIN # 1FTWW31P56EC19134 ("Vehicle"),
28  from Maita Ford, which was in the City of Auburn, County of Placer, State of

                                    -1-
            Venue Declaration for Consumers Legal Remedies Act

1  California.

2  3.  The Complaint that will be filed in this matter contains a cause of action for violation of

3  the Consumers Legal Remedies Act.

4  4.  Defendant FORD MOTOR COMPANY is and was a Delaware Corporation registered to

5  do business in the State of California, and at all times relevant hereto was engaged in conducting

6  business in Los Angeles County with its agent for service in process in Los Angeles.

7  5.  The acts, practices, policies, and procedures which form the basis of this action, or a

8  substantial portion thereof, occurred in Placer County, and at the location of Defendant FORD

9  MOTOR COMPANY's principle place of business in the City of Auburn, County of Placer, State

10  of California.

11  6.  In compliance with Civil Code, section 1780, subdivision (c), this cause of action has been

12  properly commenced in the proper county or judicial district for trial.

13  I declare under penalty of perjury under the laws of the State of California that the

14  foregoing is true and correct and was executed by me in Newcastle, California, on

15  10/29/2018 _____.

16

17  *Alan Wittinger*

18  ALAN J. WITTINGER

19

20

21

22

23

24

25

26

27

28

-2-

Venue Declaration for Consumers Legal Remedies Act

COPY

1

KNIGHT LAW GROUP, LLP
Steve Mikhov (SBN 224676)

2

stevem@knightlaw.com
Amy Morse (SBN 290502)

3

amym@knightlaw.com
10250 Constellation Blvd., Suite 2500

4

Los Angeles. CA 90067

5

Telephone: (310) 552-2250
Fax: (310) 552-7973

6

7

Attorney for Plaintiffs,
KORI A. WITTINGER and

8

ALAN J. WITTINGER

FILED
Superior Court of California
County of Placer

NOV 14 2018

Jake Chatters
Executive Officer & Clerk
By: S. Hubbard, Deputy

9

10

## SUPERIOR COURT OF CALIFORNIA

11

## COUNTY OF LOS ANGELES

12

KORI A. WITTINGER and
ALAN J. WITTINGER,

13

14

Plaintiffs,

15

16

vs.

17

18

FORD MOTOR COMPANY, a Delaware
Corporation; D.O. NERONDE, INC., a

19

California Corporation, dba AUBURN

20

FORD; and DOES 1 through 10, inclusive,

21

22

Defendants.

23

24

25

26

27

28

Case No.:   **S C V   0 0 4 2 1 2 6**

Unlimited Jurisdiction

**DEMAND FOR JURY TRIAL**

*Assigned for All Purposes to the
Honorable*

Department

BY FAX

**DEMAND FOR JURY TRIAL**

1

## DEMAND FOR JURY TRIAL

2  Plaintiffs, KORI A. WITTINGER and ALAN J. WITTINGER, hereby demand trial by jury in this

3  action.

4

5  Dated: _11/13/18_                                    KNIGHT LAW GROUP, LLP

6

7

8                                                        STEVE MIKHOV (SBN 224676)
9                                                        AMY MORSE (SBN 290502)
                                                         Attorney for Plaintiffs,
10                                                       KORI A. WITTINGER and
11                                                       ALAN J. WITTINGER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B

SPENCER P. HUGRET (SBN: 240424)
shugret@grsm.com
TIMOTHY A. HANNA (SBN: 310620)
thanna@grsm.com
GORDON REES SCULLY MANSUKHANI, LLP
Embarcadero Center West
275 Battery Street, Suite 2000
San Francisco, CA  94111
Telephone: (415) 986-5900
Facsimile: (415) 986-8054

Attorneys for Defendant
FORD MOTOR COMPANY

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF PLACER

**DEC 11 2018**

JAKE CHATTERS
EXECUTIVE OFFICER & CLERK
By: C. Waggoner, Deputy

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF PLACER

|  |  |
|---|---|
| KORI A. WITTINGER and ALAN J. WITTINGER,<br><br>                           Plaintiffs,<br><br>        vs.<br><br>FORD MOTOR COMPANY, a Delaware Corporation; D.O. NERONDE, INC., a California Corporation dba AUBURN FORD; and DOES 1 through 10, inclusive,<br><br>                           Defendants. | Case No. SCV 0042126<br>Unlimited Jurisdiction<br><br>**DEFENDANT FORD MOTOR COMPANY'S ANSWER TO PLAINTIFFS KORI A. WITTINGER AND ALAN J. WITTINGER'S COMPLAINT**<br><br>Complaint Filed:  November 14, 2018 |

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

1

1    Defendant FORD MOTOR COMPANY ("Ford"), for itself alone and for no other

2    parties, hereby answers Plaintiffs KORI A. WITTINGER and ALAN J. WITTINGER's

3    ("Plaintiffs'") Complaint as follows:

4    Under the provisions of section 431.30(d) of the Code of Civil Procedure, Ford denies

5    each and every allegation, both specifically and generally, of each cause of action contained in

6    Plaintiffs' Complaint on file herein and the whole thereof, and denies that Plaintiffs were

7    damaged in any sum or sums, or at all.

8    Further answering the Complaint, and the whole thereof, including each and every

9    cause of action contained therein, Ford denies that Plaintiffs have or will sustain any injury,

10   damage or loss, if any, by reason of any act or omission, fault or negligence on the part of

11   Ford, its agents, servants and employees, or any of them.

12   **SEPARATE AFFIRMATIVE DEFENSES**

13   For further and separate answer to the Complaint and by way of affirmative defense,

14   Ford alleges as follows:

15   **FIRST AFFIRMATIVE DEFENSE**

16   **(Failure to State Cause of Action**)

17   1.    Plaintiffs' Complaint, and each and every cause of action alleged therein, fails to

18   state facts sufficient to constitute a cause of action against Ford and Ford denies that Plaintiffs

19   were damaged in any sum or sums, or at all.

20   **SECOND AFFIRMATIVE DEFENSE**

21   **(Statute of Limitations)**

22   2.    Ford is informed and believes, and on that basis alleges, that some or all of

23   Plaintiffs' claims may be barred by the statute of limitations including, but not limited to,

24   limitations contained within Code of Civil Procedure sections 335.1, 337, 338, 338.1, and 340;

25   Civil Code sections 1783 and 1791.1; and/or Commercial Code section 2725.

26   //

27   //

28   //

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

2

DEFENDANT FORD MOTOR COMPANY's ANSWER TO PLAINTIFFS KORI A. WITTINGER AND
ALAN J. WITTINGER'S COMPLAINT

**THIRD AFFIRMATIVE DEFENSE**

**(Estoppel)**

3.     Plaintiffs are estopped from obtaining the relief sought, or pursing any of the claims raised or causes of actions contained in the Complaint, by virtue of their acts, failures to act, conduct, representations, admissions, and the like.

**FOURTH AFFIRMATIVE DEFENSE**

**(Waiver)**

4.     Plaintiffs have waived their rights to the claims, causes of action and relief sought in this Complaint against Ford, by virtue of their acts, failures to act, conduct, representations, admissions, and the like.

**FIFTH AFFIRMATIVE DEFENSE**

**(Laches)**

5.     Plaintiffs have unreasonably delayed the commencement of this action to the prejudice of Ford.  Therefore, the Complaint, and each and every cause of action alleged therein is barred, in whole or in part, by the doctrine of laches.

**SIXTH AFFIRMATIVE DEFENSE**

**(Economic Loss Rule)**

6.     Plaintiffs' causes of action have not accrued because Plaintiffs cannot establish that they suffered injury directly from the subject vehicle or products, and therefore Plaintiffs' contention that the subject vehicle or products failed to adequately perform their functions are barred by the economic loss rule.

**SEVENTH AFFIRMATIVE DEFENSE**

**(Vehicle Fit for Intended Purpose)**

7.     Ford is informed and believes, and on that basis alleges, that the subject vehicle was fit for providing transportation at all relevant times hereto.  Accordingly, Plaintiffs are not entitled to relief for breach of the implied warranty of merchantability.  *American Suzuki Motor Corporation v. Superior Court* (1995) 37 Cal.App.4th 1291.

//

DEFENDANT FORD MOTOR COMPANY's ANSWER TO PLAINTIFFS KORI A. WITTINGER AND ALAN J. WITTINGER'S COMPLAINT

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

**EIGHTH AFFIRMATIVE DEFENSE**

**(Duration of Implied Warranty)**

8.      Ford is informed and believes, and on that basis alleges, that some or all of the alleged defects did not arise until more than three months had elapsed since the subject vehicle was sold to Plaintiffs.  Accordingly, Plaintiffs are not entitled to relief for such concerns under the breach of the implied warranty of merchantability.  Civil Code section 1795.5.

**NINTH AFFIRMATIVE DEFENSE**

**(Lack of Maintenance and Other Exclusions)**

9.      Ford is informed and believes, and on that basis alleges, that Plaintiffs and/or others may have improperly cared for and maintained the subject vehicle, and that some of Plaintiffs' concerns may have been proximately caused by such lack of maintenance of the subject vehicle or products.  Ford reserves the right to identify additional exclusions which may be applicable.

**TENTH AFFIRMATIVE DEFENSE**

**(Unreasonable or Unauthorized Use of Vehicle)**

10.     Ford is informed and believes, and on that basis alleges, that some of Plaintiffs' concerns may be barred by Plaintiffs' unreasonable or unauthorized use of the vehicle.  Civil Code section 1794.3.

**ELEVENTH AFFIRMATIVE DEFENSE**

**(No Timely Revocation of Acceptance)**

11.     Plaintiffs have no restitution remedy under breach of implied warranty because there was no timely revocation of acceptance before a substantial change in the condition of the goods.

**TWELFTH AFFIRMATIVE DEFENSE**

**(No Reasonable Number of Attempts to Repair Afforded)**

12.     The Complaint and, each and every cause of action therein, does not state facts sufficient to meet the statutory presumption of a reasonable number of repair attempts under the terms of the Civil Code section 1793.22(b).

DEFENDANT FORD MOTOR COMPANY's ANSWER TO PLAINTIFFS KORI A. WITTINGER AND ALAN J. WITTINGER'S COMPLAINT

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Preemption)

13.   The Complaint and, each and every cause of action therein, in whole, or in part, are preempted by the Federal National Traffic and Motor Vehicle Safety Act pursuant to 49 U.S.C. sections 30118, *et seq.*

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Performance)

14.   Prior to the commencement of this action, Ford fully performed, satisfied and discharged all duties and obligations it may have owed to Plaintiffs arising out of any and all agreements, representations or contracts made by it or on its behalf and this action is therefore barred by the provisions of Civil Code section 1473.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Failure to Abide by Terms of Warranty)

15.   Claims by Plaintiffs of breach of warranty are barred because of Plaintiffs' failure to give timely and appropriate notice of any claim of breach of warranty.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Failure to Use Third-Party Dispute Resolution)

16.   Ford makes available a qualified third-party dispute resolution process, and therefore, it is entitled to relief under certain provisions of the Song-Beverly Consumer Warranty Act.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Accord and Satisfaction)

17.   Plaintiffs are barred from recovery, in whole or in part, on the ground that they are subject to the defense of accord and satisfaction.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Good Faith Evaluation)

18.   At all times, Ford's evaluation of Plaintiffs' repurchase request has been in good faith, consequently, Plaintiffs have no claim for civil penalty for any alleged willful violation.

*Gordon Rees Scully Mansukhani, LLP*
*275 Battery Street, Suite 2000*
*San Francisco, CA 94111*

5

DEFENDANT FORD MOTOR COMPANY's ANSWER TO PLAINTIFFS KORI A. WITTINGER AND ALAN J. WITTINGER'S COMPLAINT

## NINETEENTH AFFIRMATIVE DEFENSE

### (Doctrine of Equitable Abstention)

19.     Plaintiffs' claims for injunctive relief are barred by the doctrine of equitable abstention.

## TWENTIETH AFFIRMATIVE DEFENSE

### (Failure to Notify)

20.     Ford is informed and believes, and on that basis alleges, that Plaintiffs failed to provide timely notice, within a reasonable period of time after discovery of their claims and alleged defects.  As a result, Ford has been damaged and prejudiced.  Therefore, the Complaint and each cause of action therein, are barred as a matter of law.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Complete Performance)

21.     Ford has appropriately, completely and fully performed and discharged any and all obligations and legal duties arising out of the matters alleged in the Complaint.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### (Compliance with Laws)

22.     Ford has complied with all laws and regulations with regard to the subject matter of Plaintiffs' Complaint, and is therefore not liable to Plaintiffs for any damages they may have sustained, if any.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

### (Good Faith)

23.     At all times relevant and material to this action, Ford acted reasonably and in good faith.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### (Independent Causes)

24.     The alleged injuries, damages or loss, if any, for which Plaintiffs seek recovery, were the result of causes independent of any purported acts or omissions on the part of Ford,

//

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

1   or any of its agents, representatives or employees, thereby eliminating or reducing the alleged

2   liability of Ford.

3   ### TWENTY-FIFTH AFFIRMATIVE DEFENSE

4   ### (Failure to Inspect)

5        25.    Ford alleges that Plaintiffs damages, if any, may have been caused by the failure

6   of third parties, unrelated to Ford, to properly inspect the subject vehicle or products, thereby

7   eliminating or reducing the alleged liability of Ford.

8   ### TWENTY-SIXTH AFFIRMATIVE DEFENSE

9   ### (Failure to Maintain)

10        26.    Ford alleges that any and all conditions in the subject vehicle or products

11   described in the Complaint, if any there were, were solely a result of the failure to properly

12   maintain and service the subject vehicle or products, thereby eliminating or reducing the

13   alleged liability of Ford.

14   ### TWENTY-SEVENTH AFFIRMATIVE DEFENSE

15   ### (No Breach)

16        27.    Ford alleges that it did not breach any duties to Plaintiffs, thereby barring and/or

17   precluding Plaintiffs from recovery.

18   ### TWENTY-EIGHTH AFFIRMATIVE DEFENSE

19   ### (No Affirmative Conduct)

20        28.    Ford alleges that there was no affirmative conduct on the part of Ford, which

21   allegedly caused or contributed to Plaintiffs' alleged injuries and therefore Plaintiffs have no

22   cause of action against Ford.

23   ### TWENTY-NINTH AFFIRMATIVE DEFENSE

24   ### (No Substantial Factor)

25        29.    Ford alleges that the negligence and other legal fault alleged in the Complaint as

26   against Ford, if any, was not a substantial factor in bringing about Plaintiffs' alleged injuries

27   and, therefore, was not a contributing cause.

28   //

DEFENDANT FORD MOTOR COMPANY's ANSWER TO PLAINTIFFS KORI A. WITTINGER AND
ALAN J. WITTINGER'S COMPLAINT

*Gordon Rees Scully Mansukhani, LLP*
*275 Battery Street, Suite 2000*
*San Francisco, CA 94111*

**THIRTIETH AFFIRMATIVE DEFENSE**

**(Excessive/Speculative Damages)**

30.    Ford alleges that the damages allegedly sustained by Plaintiffs, if any, were excessive, exaggerated, unreasonable, speculative, inflated or otherwise unnecessary and/or unrelated to the alleged incident.

**THIRTY-FIRST AFFIRMATIVE DEFENSE**

**(Failure to Mitigate)**

31.    If Plaintiffs have suffered any loss, damage or injury, it was directly or proximately caused by and is the result of Plaintiff's conduct and/or their potential failure to mitigate any such loss, damage or injury.

**THIRTY-SECOND AFFIRMATIVE DEFENSE**

**(Disclaimer of Incidental and Consequential Damages)**

32.    Ford is informed and believes, and on that basis alleges, that by the terms of the limited warranty for the subject vehicle at issue, Ford is not liable for incidental or consequential damages.

**THIRTY-THIRD AFFIRMATIVE DEFENSE**

**(No Civil Penalty)**

33.    Ford is informed and believes, and on that basis alleges, that Plaintiffs are barred from the recovery of a civil penalty by reason of Plaintiffs' failure to serve written notice pursuant to Civil Code section 1794(e)(3).

**THIRTY-FOURTH AFFIRMATIVE DEFENSE**

**(Constitutionality of Punitive Damages)**

34.    The claims of Plaintiffs are in contravention of Ford's rights under applicable clauses of the United States and California Constitutions, including without limitation the following provisions:  (a) said claims constitute an impermissible burden on interstate commerce in contravention of Article I, Section 8 of the United States Constitution; (b) said claims contravene the Excessive Fines Clause of the Eighth Amendment of the United States Constitution; (c) said claims violate Ford's right to Due Process under the Fourteenth

DEFENDANT FORD MOTOR COMPANY's ANSWER TO PLAINTIFFS KORI A. WITTINGER AND ALAN J. WITTINGER'S COMPLAINT

*Gordon Rees Scully Mansukhani, LLP*
*275 Battery Street, Suite 2000*
*San Francisco, CA  94111*

Amendment of the United States Constitution; (d) said claims contravene the constitutional prohibition against vague and overbroad laws; and (e) said claims contravene the Due Process Clause of the California Constitution.

### THIRTY-FIFTH AFFIRMATIVE DEFENSE

### (Punitive Damages Improperly Pled/Not Recoverable)

35.     Ford is informed and believes, and on that basis alleges, that Plaintiffs have not properly pled a claim for punitive damages and these damages are not recoverable based on the facts contained in Plaintiffs' Complaint, or are otherwise barred by the provisions of Civil Code sections 3294, 3295, and 3296, or such conduct was adopted, ratified or authorized by Ford under Civil Code section 3294(b).

### THIRTY-SIXTH AFFIRMATIVE DEFENSE

### (Punitive Damages Impermissible For Extra-Territorial Conduct)

36.     Any award of punitive damages based on anything other than Ford's conduct in connection with the design, manufacture, and sale of the subject vehicle or products that are the subject of this lawsuit would violate the due process clause of the Fourteenth Amendment to the United States Constitution because any other judgment for punitive damages in this case cannot protect Ford against impermissible multiple punishment for the same wrong and against punishment for extra-territorial conduct.

### THIRTY-SEVENTH AFFIRMATIVE DEFENSE

### (Punitive Damages Unconstitutional)

37.     Ford is informed and believes, and on that basis alleges, that an award of punitive or exemplary damages to Plaintiffs would violate Ford's constitutional rights under the provisions of the United States and California Constitutions, including but not limited to the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 7 of the California Constitution because, among other things, (1) any award of punitive or exemplary damages would be grossly out of proportion to the alleged wrongful conduct and purported injury at issue here; (2) there is no legitimate state interest in punishing the alleged wrongful conduct at issue here, or in deterring its possible

DEFENDANT FORD MOTOR COMPANY's ANSWER TO PLAINTIFFS KORI A. WITTINGER AND ALAN J. WITTINGER'S COMPLAINT

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1   repetition; (3) the alleged wrongful conduct at issue here is lawful in other jurisdictions; (4)

2   the alleged wrongful conduct at issue here is not sufficiently reprehensible to warrant the

3   imposition of any punitive or exemplary damages; and (5) the criteria for the imposition of

4   punitive or exemplary damage are unconstitutionally vague and uncertain and fail to provide

5   fair notice of what conduct will result in the imposition of such damages.

6   **THIRTY-EIGHTH AFFIRMATIVE DEFENSE**

7   **(Punitive Damages -- If Any -- Must Be Limited)**

8       38.   Ford specifically incorporates by reference, as if fully set forth herein, any and

9   all standards or limitations regarding the determination and enforceability of punitive damages

10  awards as set forth in *State Farm Mutual Automobile Insurance Company v. Campbell* (2003)

11  123 S.Ct. 1513, and *BMW of North America v. Gore* (1996) 116 S. Ct. 1589.

12  **THIRTY-NINTH AFFIRMATIVE DEFENSE**

13  **(Set Off)**

14      39.   Ford alleges that if it is established that Ford is in any manner legally responsible

15  for any of the damages claimed by Plaintiffs, which is denied, Ford is entitled to a set off of

16  these damages, if any, that resulted from the wrongful acts of Plaintiffs and/or others.

17  **FORTIETH AFFIRMATIVE DEFENSE**

18  **(Spoliation of Evidence)**

19      40.   The subject vehicle or products identified in the Complaint that were allegedly

20  designed, manufactured and distributed by Ford are missing, have been modified or altered

21  and/or are no longer available for Ford's inspection, which impacts Ford's defense in this

22  case.  Ford is therefore entitled to relief from this spoliation, including appropriate jury

23  instructions, admonitions and any other relief afforded by the Court.

24  **FORTY-FIRST AFFIRMATIVE DEFENSE**

25  **(Fees and Costs)**

26      41.   Ford is informed and believes, and on that basis alleges, that the Complaint was

27  brought without reasonable cause and without a good faith belief that there was a justifiable

28  controversy under the facts or the law which warranted the filing of the Complaint against

10

DEFENDANT FORD MOTOR COMPANY's ANSWER TO PLAINTIFFS KORI A. WITTINGER AND
ALAN J. WITTINGER'S COMPLAINT

1  Ford.  Plaintiffs should therefore be responsible for all of Ford's necessary and reasonable

2  attorney's fees and defense costs as permitted by California law.

### FORTY-SECOND AFFIRMATIVE DEFENSE

### (Additional Affirmative Defenses)

42.     Ford reserves its rights to raise and plead additional defenses and/or affirmative defenses which might become known during the course of discovery, as well as to dismiss any defenses which, as a result of discovery, are determined to be unsupported by good faith reliance upon either the facts or the law, or a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

### PRAYER

WHEREFORE, Ford prays for the following relief:

1.     That Plaintiffs take nothing by reason of their Complaint, and that this action be dismissed in its entirety with prejudice;

2.     That judgment be entered in favor of Ford, on all causes of action;

3.     That Ford recover its costs of suit incurred herein as well as attorneys' fees to the extent permitted by law; and,

4.     That Ford be awarded such other and further relief as the Court may deem just and proper.


Dated:  December 11, 2018                    GORDON REES SCULLY MANSUKHANI LLP


By:  _____

                                                            Spencer P. Hugret
                                                            Timothy A. Hanna
                                                            Attorneys for Defendant
                                                            FORD MOTOR COMPANY

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

DEFENDANT FORD MOTOR COMPANY's ANSWER TO PLAINTIFFS KORI A. WITTINGER AND ALAN J. WITTINGER'S COMPLAINT

**PROOF OF SERVICE**
*Wittinger, Kori A. et al.  v. Ford Motor Company, et al.*
Placer County Superior Court Case No. SVC 0042126

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is: Gordon Rees Scully Mansukhani, LLP 275 Battery Street, Suite 2000, San Francisco, CA  94111.  On the below-mentioned date, I served the within documents:

**DEFENDANT FORD MOTOR COMPANY'S ANSWER TO PLAINTIFFS KORI A. WITTINGER AND ALAN J. WITTINGER'S COMPLAINT**

☐ by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☐ by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☒ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in United States mail in the State of California at San Francisco, addressed as set forth below.

☐ by placing a true copy thereof enclosed in a sealed envelope, at a station designated for collection and processing of envelopes and packages for overnight delivery by FedEx as part of the ordinary business practices of Gordon & Rees LLP described below, addressed as follows:

Steve Mikhov
Knight Law Group
10250 Constellation Blvd., Suite 2500
Los Angeles, CA 90067
Tel.: (310) 552-2250
Fax: (310) 552-7973
***Attorney for Plaintiffs***

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on December 11, 2018, at San Francisco, California.

_____
Christine Nusser

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

**EXHIBIT C**

1   SPENCER P. HUGRET (SBN: 240424)
    shugret@grsm.com
2   TIMOTHY A. HANNA (SBN: 310620)
    thanna@grsm.com
3   GORDON REES SCULLY MANSUKHANI, LLP
    Embarcadero Center West
4   275 Battery Street, Suite 2000
    San Francisco, CA  94111
5   Telephone: (415) 986-5900
    Facsimile: (415) 986-8054
6
    Attorneys for Defendant
7   D.O. NERONDE, INC. DBA
    AUBURN FORD
8

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF PLACER

**DEC 11 2018**

JAKE CHATTERS
EXECUTIVE OFFICER & CLERK
By: C. Waggoner, Deputy

9       **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10          **FOR THE COUNTY OF PLACER**

11

12  KORI A. WITTINGER and ALAN J.          )   Case No. SVC 0042126
    WITTINGER,                             )   Unlimited Jurisdiction
13                                         )
                                           )
14                    Plaintiffs,          )   **DEFENDANT D.O. NERONDE, INC.**
                                           )   **DBA AUBURN FORD'S ANSWER TO**
15          vs.                            )   **PLAINTIFFS KORI A. WITTINGER**
                                           )   **AND ALAN J. WITTINGER'S**
16  FORD MOTOR COMPANY, a Delaware         )   **COMPLAINT**
    Corporation; D.O. NERONDE, INC., a     )
17  California Corporation dba AUBURN FORD; )
    and DOES 1 through 10, inclusive,      )   Complaint Filed:  November 14, 2018
18                                         )
                      Defendants.          )
19  _____  )

20

21

22

23

24

25

26

27

28

1
DEFENDANT D.O. NERONDE, INC. DBA AUBURN FORD's ANSWER TO PLAINTIFFS KORI A.
WITTINGER AND ALAN J. WITTINGER'S COMPLAINT

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1    Defendant D.O. NERONDE, INC. dba AUBURN FORD ("Auburn Ford") for itself

2    alone and for no other parties, hereby answers Plaintiffs KORI A. WITTINGER and ALAN J.

3    WITTINGER's ("Plaintiffs") Complaint as follows:

4    Under the provisions of section 431.30(d) of the Code of Civil Procedure, Auburn Ford

5    denies each and every allegation, both specifically and generally, of each cause of action

6    contained in Plaintiffs' Complaint on file herein and the whole thereof, and denies that Plaintiffs

7    were damaged in any sum or sums, or at all.

8    Further answering the Complaint, and the whole thereof, including each and every

9    cause of action contained therein, Auburn Ford denies that Plaintiffs have or will sustain any

10   injury, damage or loss, if any, by reason of any act or omission, fault or negligence on the part

11   of Auburn Ford, its agents, servants and employees, or any of them.

12                   **SEPARATE AFFIRMATIVE DEFENSES**

13   For further and separate answer to the Complaint and by way of affirmative defense,

14   Auburn Ford alleges as follows:

15                       **FIRST AFFIRMATIVE DEFENSE**

16                   **(Failure to State Cause of Action**)

17   1.    Plaintiffs' Complaint, and each and every cause of action alleged therein, fails to

18   state facts sufficient to constitute a cause of action against Auburn Ford and Auburn Ford

19   denies that Plaintiffs were damaged in any sum or sums, or at all.

20                      **SECOND AFFIRMATIVE DEFENSE**

21                       **(Statute of Limitations)**

22   2.    Auburn Ford is informed and believes, and on that basis alleges, that some or all

23   of Plaintiffs' claims may be barred by the statute of limitations including, but not limited to,

24   limitations contained within Code of Civil Procedure sections 335.1, 337, 338, 339 and 340.

25   //

26   //

27   //

28   //

*(left margin)* Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

2

DEFENDANT D.O. NERONDE, INC. DBA AUBURN FORD's ANSWER TO PLAINTIFFS KORI A.
WITTINGER AND ALAN J. WITTINGER'S COMPLAINT

**THIRD AFFIRMATIVE DEFENSE**

**(Estoppel)**

3.    Plaintiffs are estopped from obtaining the relief sought, or pursing any of the claims raised or causes of actions contained in their Complaint, by virtue of their acts, failures to act, conduct, representations, admissions, and the like.

**FOURTH AFFIRMATIVE DEFENSE**

**(Waiver)**

4.    Plaintiffs have waived their rights to the claims, causes of action and relief sought in their Complaint against Auburn Ford, by virtue of their acts, failures to act, conduct, representations, admissions, and the like.

**FIFTH AFFIRMATIVE DEFENSE**

**(Laches)**

5.    Plaintiffs have unreasonably delayed the commencement of this action to the prejudice of Auburn Ford.  Therefore, the Complaint, and each and every cause of action alleged therein is barred, in whole or in part, by the doctrine of laches.

**SIXTH AFFIRMATIVE DEFENSE**

**(Economic Loss Rule)**

6.    Plaintiffs' causes of action have not accrued because Plaintiffs cannot establish that they suffered injury directly from the subject vehicle or products, and therefore Plaintiffs' contention that the subject vehicle or products failed to adequately perform their functions are barred by the economic loss rule.

**SEVENTH AFFIRMATIVE DEFENSE**

**(Lack of Maintenance and Other Exclusions)**

7.    Auburn Ford is informed and believes, and on that basis alleges, that Plaintiffs and/or others may have improperly cared for and maintained the subject vehicle, and that some of Plaintiffs' concerns may have been proximately caused by such lack of maintenance of the subject vehicle or products.  Auburn Ford reserves the right to identify additional exclusions which may be applicable.

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

**EIGHTH AFFIRMATIVE DEFENSE**

**(Unreasonable or Unauthorized Use of Vehicle)**

8.      Auburn Ford is informed and believes, and on that basis alleges, that some of Plaintiffs' concerns may be barred by Plaintiffs' unreasonable or unauthorized use of the vehicle.  Civil Code section 1794.3.

**NINTH AFFIRMATIVE DEFENSE**

**(Preemption)**

9.      The Complaint and each and every cause of action therein, in whole, or in part, are preempted by the Federal National Traffic and Motor Vehicle Safety Act pursuant to 49 U.S.C. sections 30118, *et seq.*

**TENTH AFFIRMATIVE DEFENSE**

**(Performance)**

10.      Prior to the commencement of this action, Auburn Ford fully performed, satisfied and discharged all duties and obligations it may have owed to Plaintiffs arising out of any and all agreements, representations or contracts made by it or on its behalf and this action is therefore barred by the provisions of Civil Code section 1473.

**ELEVENTH AFFIRMATIVE DEFENSE**

**(Accord and Satisfaction)**

11.      Plaintiffs are barred from recovery, in whole or in part, on the ground that they are subject to the defense of accord and satisfaction.

**TWELFTH AFFIRMATIVE DEFENSE**

**(Doctrine of Equitable Abstention)**

12.      Plaintiffs' claims for injunctive relief are barred by the doctrine of equitable abstention.

//

//

//

//

DEFENDANT D.O. NERONDE, INC. DBA AUBURN FORD's ANSWER TO PLAINTIFFS KORI A. WITTINGER AND ALAN J. WITTINGER'S COMPLAINT

*Gordon Rees Scully Mansukhani, LLP*
*275 Battery Street, Suite 2000*
*San Francisco, CA  94111*

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Failure to Notify)

13.     Auburn Ford is informed and believes, and on that basis alleges, that Plaintiffs failed to provide timely notice, within a reasonable period of time after discovery of their claims and alleged defects.  As a result, every cause of action therein, is barred as a matter of law.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Complete Performance)

14.     Auburn Ford has appropriately, completely and fully performed and discharged any and all obligations and legal duties arising out of the matters alleged in the Complaint.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Compliance with Laws)

15.     Auburn Ford has complied with all laws and regulations with regard to the subject matter of Plaintiffs' Complaint, and is therefore not liable to Plaintiffs for any damages they may have sustained, if any.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Good Faith)

16.     At all times relevant and material to this action, Auburn Ford acted reasonably and in good faith.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Independent Causes)

17.     The alleged injuries, damages or loss, if any, for which Plaintiffs seek recovery, were the result of causes independent of any purported acts or omissions on the part of Auburn Ford, or any of its agents, representatives or employees, thereby eliminating or reducing the alleged liability of Auburn Ford.

//

//

//

DEFENDANT D.O. NERONDE, INC. DBA AUBURN FORD's ANSWER TO PLAINTIFFS KORI A. WITTINGER AND ALAN J. WITTINGER'S COMPLAINT

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Failure to Inspect)

18.     Auburn Ford alleges that Plaintiffs' damages, if any, may have been caused by the failure of third parties, unrelated to Auburn Ford, to properly inspect the subject vehicle or products, thereby eliminating or reducing the alleged liability of Auburn Ford.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Failure to Maintain)

19.     Auburn Ford alleges that any and all conditions in the subject vehicle or products described in the Complaint, if any there were, were solely a result of the failure to properly maintain and service the subject vehicle or products, thereby eliminating or reducing the alleged liability of Auburn Ford.

## TWENTIETH AFFIRMATIVE DEFENSE

### (No Breach)

20.     Auburn Ford alleges that it did not breach any duties to Plaintiffs, thereby barring and/or precluding Plaintiffs from recovery.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (No Affirmative Conduct)

21.     Auburn Ford alleges that there was no affirmative conduct on the part of Auburn Ford, which allegedly caused or contributed to Plaintiffs' alleged injuries and therefore Plaintiffs have no cause of action against Auburn Ford.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### (No Substantial Factor)

22.     Auburn Ford alleges that the negligence and other legal fault alleged in the Complaint as against Auburn Ford, if any, was not a substantial factor in bringing about Plaintiffs' alleged injuries and, therefore, was not a contributing cause.

//

//

//

DEFENDANT D.O. NERONDE, INC. DBA AUBURN FORD's ANSWER TO PLAINTIFFS KORI A. WITTINGER AND ALAN J. WITTINGER'S COMPLAINT

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

**TWENTY-THIRD AFFIRMATIVE DEFENSE**

**(Excessive/Speculative Damages)**

23.    Auburn Ford alleges that the damages allegedly sustained by Plaintiffs, if any, were excessive, exaggerated, unreasonable, speculative, inflated or otherwise unnecessary and/or unrelated to the alleged incident.

**TWENTY-FOURTH AFFIRMATIVE DEFENSE**

**(Failure to Mitigate)**

24.    If Plaintiffs have suffered any loss, damage or injury, it was directly or proximately caused by and is the result of Plaintiffs' conduct and/or their potential failure to mitigate any such loss, damage or injury.

**TWENTY-FIFTH AFFIRMATIVE DEFENSE**

**(Set Off)**

25.    Auburn Ford alleges that if it is established that Auburn Ford is in any manner legally responsible for any of the damages claimed by Plaintiffs, which is denied, Auburn Ford is entitled to a set off of these damages, if any, that resulted from the wrongful acts of Plaintiffs and/or others.

**TWENTY-SIXTH AFFIRMATIVE DEFENSE**

**(Spoliation of Evidence)**

26.    The subject vehicle or products identified in the Complaint that were allegedly repaired by Auburn Ford are missing, have been modified or altered and/or are no longer available for Auburn Ford's inspection, which impacts Auburn Ford's defense in this case.  Auburn Ford is therefore entitled to relief from this spoliation, including appropriate jury instructions, admonitions and any other relief afforded by the Court.

**TWENTY-SEVENTH AFFIRMATIVE DEFENSE**

**(Fees and Costs)**

27.    Auburn Ford is informed and believes, and on that basis alleges, that the Complaint was brought without reasonable cause and without a good faith belief that there was a justifiable controversy under the facts or the law which warranted the filing of the

7

1 | Complaint against Auburn Ford. Plaintiffs should therefore be responsible for all of Auburn

2 | Ford's necessary and reasonable attorney's fees and defense costs as permitted by California

3 | law.

4 | **TWENTY-EIGHTH AFFIRMATIVE DEFENSE**

5 | **(Additional Affirmative Defenses)**

6 | 28.    Auburn Ford reserves its rights to raise and plead additional defenses and/or

7 | affirmative defenses which might become known during the course of discovery, as well as to

8 | dismiss any defenses which, as a result of discovery, are determined to be unsupported by

9 | good faith reliance upon either the facts or the law, or a non-frivolous argument for the

10 | extension, modification, or reversal of existing law or the establishment of new law.

11 | **PRAYER**

12 | WHEREFORE, Auburn Ford prays for the following relief:

13 | 1.    That Plaintiffs take nothing by reason of their Complaint, and that this action be

14 | dismissed in its entirety with prejudice;

15 | 2.    That judgment be entered in favor of Auburn Ford, on all causes of action;

16 | 3.    That Auburn Ford recover its costs of suit incurred herein as well as attorneys'

17 | fees to the extent permitted by law; and

18 | 4.    That Auburn Ford be awarded such other and further relief as the Court may

19 | deem just and proper.

20

21

22 | Dated:  December 11, 2018          GORDON REES SCULLY MANSUKHANI LLP

23

24

25 | By: _____

26 | Spencer P. Hugret
Timothy A. Hanna
Attorneys for Defendant

27 | D.O. NERONDE, INC. DBA AUBURN
FORD

28

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

8

DEFENDANT D.O. NERONDE, INC. DBA AUBURN FORD's ANSWER TO PLAINTIFFS KORI A.
WITTINGER AND ALAN J. WITTINGER'S COMPLAINT

**PROOF OF SERVICE**

*Wittinger, Kori A. et al.  v. Ford Motor Company, et al.*
Placer County Superior Court Case No. SVC 0042126

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is: Gordon Rees Scully Mansukhani, LLP 275 Battery Street, Suite 2000, San Francisco, CA  94111.  On the below-mentioned date, I served the within documents:

**DEFENDANT D.O. NERONDE, INC. DBA AUBURN FORD'S ANSWER TO PLAINTIFFS KORI A. WITTINGER AND ALAN J. WITTINGER'S COMPLAINT**

☐    by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☐    by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☒    by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in United States mail in the State of California at San Francisco, addressed as set forth below.

☐    by placing a true copy thereof enclosed in a sealed envelope, at a station designated for collection and processing of envelopes and packages for overnight delivery by FedEx as part of the ordinary business practices of Gordon & Rees LLP described below, addressed as follows:

Steve Mikhov
Knight Law Group
10250 Constellation Blvd., Suite 2500
Los Angeles, CA 90067
Tel.: (310) 552-2250
Fax: (310) 552-7973
*Attorney for Plaintiffs*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on December 11, 2018, at San Francisco, California.

_____
Christine Nusser

*Gordon Rees Scully Mansukhani, LLP*
*275 Battery Street, Suite 2000*
*San Francisco, CA 94111*